In the Matter of TESSIM ZORACH et al., Appellants, against ANDREW G. CLAUSON, JR., et al., Constituting the Board of Education of the City of New York, et al., Respondents, and GREATER NEW YORK COORDINATING COMMITTEE ON RELEASED TIME OF JEWS, PROTESTANTS AND ROMAN CATHOLICS, Intervener, Respondent.

Argued May 31, 1951; decided July 11, 1951.

*Kenneth W. Greenawalt, Leo Pfeffer, Edwin Lukas* and *Sol Rabkin* for appellants. I. The New York City released time program, as authorized by the statute and respondents' regulations, is unconstitutional. (*Illinois ex rel. McCollum* v. *Board of Educ.,* 333 U. S. 203; *Bernat* v. *Bicek,* 91 N. E. 2d 588 [Ill.]; *Kunz* v. *New York,* 340 U. S. 290; *County of Milwaukee* v. *Carter,*

258 Wis. 139.) II. Under any view of the *McCollum* decision, the petition is legally sufficient and if a final order for petitioners on the merits was not justified at this stage of the proceeding, at least a trial of the triable issues of fact should have been ordered. (*Matter of Newbrand* v. *City of Yonkers,* 285 N. Y. 164; *Matter of Davis* v. *Wiener,* 285 N. Y. 537; *Matter of Makely* v. *Board of Supervisors of Albany Co.,* 264 App. Div. 812; *United States* v. *Classic,* 313 U. S. 299; *Screws* v. *United States,* 325 U. S. 91; *Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287; *Busch Jewelry Co.* v. *United Retail Employees' Union,* 281 N. Y. 150; *Matter of Schwab* v. *McElligott,* 282 N. Y. 182.)

*Frank E. Karelsen, Jr.,* and *David I. Ashe* for Public Education Association and another, *amici curiæ,* in support of appellants' position. I. New York City's released time program is inherently violative of the constitutional principle of separation of church and State, as enunciated in *Illinois ex rel. McCollum* v. *Board of Educ.* (333 U. S. 203). II. Even if it be held that the New York City released time program is not unconstitutional on its face, then petitioners are entitled to a trial of the contested issues of fact raised by the pleadings. (*Everson* v. *Board of Educ.,* 330 U. S. 1.)

*Theodore Leskes, Will Maslow* and *Arnold Forster* for American Jewish Committee and others, *amici curiæ,* in support of appellants' position. Special Term erred in at least two respects: (1) in failing to award judgment to petitioners on the pleadings; and (2) in awarding judgment to respondents without hearing the triable issues of fact. (*Illinois ex rel. McCollum* v. *Board of Educ.,* 333 U. S. 203; *Everson* v. *Board of Educ.,* 330 U. S. 1; *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287.)

*R. Lawrence Siegel* for Committee on Academic Freedom of the American Civil Liberties Union and another, *amici curiæ,* in support of appellants' position. The New York City program of released time violates the constitutional principle of separation of church and State and is an invasion of the religious freedom of public school students, their parents, teachers and public

school employees. (*Meyer* v. *Nebraska,* 262 U. S. 390; *Pierce* v. *Society of Sisters,* 268 U. S. 510.)

*John P. McGrath, Corporation Counsel* (*Michael A. Castaldi, Seymour B. Quel* and *Arthur H. Kahn* of counsel), for Board of Education of the City of New York, respondent. I. The New York City "released time" program is different from the Champaign plan involved in the *McCollum* case (333 U. S. 203) in such vital respects as to render the New York plan immune from constitutional objection. (*People ex rel. Lewis* v. *Graves,* 127 Misc. 135, 219 App. Div. 233, 245 N. Y. 195; *Matter of Lewis* v. *Spaulding,* 193 Misc. 66, 299 N. Y. 564.) II. The "released time" program as operated in New York City does not violate the Federal Constitution. (*Atkin* v. *Kansas,* 191 U. S. 207; *Saltser & Weinsier, Inc.,* v. *McGoldrick,* 295 N. Y. 499; *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Prince* v. *Massachusetts,* 321 U. S. 158; *Meyer* v. *Nebraska,* 262 U. S. 390; *Cochran* v. *Louisiana State Bd. of Educ.,* 281 U. S. 370; *Bradfield* v. *Roberts,* 175 U. S. 291; *People* v. *Friedman,* 302 N. Y. 75; *Holy Trinity Church* v. *United States,* 143 U. S. 457.) III. There are no triable issues of fact. (*Matter of Ackerman* v. *Kern,* 256 App. Div. 626, 281 N. Y. 87; *Matter of Mare* v. *Dillon,* 64 N. Y. S. 2d 82, 272 App. Div. 828, 298 N. Y. 527; *Matter of Hines* v. *La Guardia,* 293 N. Y. 207; *People ex rel. Lewis* v. *Graves,* 127 Misc. 135, 219 App. Div. 233, 245 N. Y. 195; *Matter of Lewis* v. *Spaulding,* 193 Misc. 66, 299 N. Y. 564.)

*Nathaniel L. Goldstein, Attorney-General* (*Wendell P. Brown, Ruth Kessler Toch* and *John P. Powers* of counsel), for Commissioner of Education of the State of New York, respondent. I. The Court of Appeals in *People ex rel. Lewis* v. *Graves* (245 N. Y. 195) upheld as constitutional a released time plan identical with the one now established by the statute and State regulations which are before the court in the present proceeding. II. The statute, and the rules of the Commissioner of Education promulgated thereunder, do not violate the Constitution of this State or of the United States. Accordingly, the petition does not state a cause of action against respondent Commissioner of Education. "Released time" is not per se unconstitutional; it was not so held in *Illinois ex rel. McCollum* v. *Board of Educ.* (333

U. S. 203). III. Matters of policy rest with the Legislature and not with the courts. (*Thompson* v. *Wallin,* 301 N. Y. 476; *Illinois ex rel. McCollum* v. *Board of Educ.,* 333 U. S. 203.) IV. As to respondent Commissioner of Education, there is certainly no triable issue of fact. (*Matter of Ackerman* v. *Kern,* 256 App. Div. 626, 281 N. Y. 87; *Matter of La Vin,* 37 N. Y. S. 2d 161; *Matter of New York Central R. R. Co.* v. *Gillespie,* 172 Misc. 112; *Matter of Yonkers Bus, Inc.,* v. *Maltbie,* 23 N. Y. S. 2d 87, 260 App. Div. 893.) V. The release of children from schools, as permitted by the New York statute and the rules of the Commissioner of Education made thereunder, is not prohibited " aid ". It permits the very freedom of religion which the Constitution of the United States and of this State guarantee. To permit children to be excused from the schools for music lessons and other reasons but to deny them such excuse to attend religious instruction outside the schools would be to act " so as to handicap religions " and " to be their adversary." This the Constitution does not require the State to do or to be. (*Everson* v. *Board of Educ.,* 330 U. S. 1.)

*Charles H. Tuttle, Porter R. Chandler* and *Louis M. Loeb* for Greater New York Coordinating Committee on Released Time of Jews, Protestants and Roman Catholics, intervener-respondent. I. The New York statute (L. 1940, ch. 305) does not violate the First Amendment to the Constitution of the United States or any other constitutional provision. The statute is merely a recognition of the constitutional rights and responsibilities of parents, of " liberty of conscience ", and of " the free exercise and enjoyment of religious profession." (*Meyer* v. *Nebraska,* 262 U. S. 390; *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Church* v. *Bullock,* 109 S. W. 115 [Tex.]; *Holy Trinity Church* v. *United States,* 143 U. S. 457; *Bartels* v. *Iowa,* 262 U. S. 404; *West Virginia State Bd. of Educ.* v. *Barnette,* 319 U. S. 624; *Everson* v. *Board of Educ.,* 330 U. S. 1; *People* v. *Barber,* 289 N. Y. 378; *Gulf, Colorado & Santa Fe Ry. Co.* v. *Ellis,* 165 U. S. 150.) II. The New York statute authorizing released time is designed to give reasonable protection to liberty of conscience and freedom of religious profession on the part of parents. No constitutional provision erects a gateless " wall of separation " between the State and parents, or between parents and their

children, in the matter of public education. III. The *McCollum* decision (333 U. S. 203) has no application to the New York statute or to the official regulations adopted pursuant thereto. IV. The petition presents no "triable issues of fact".

*Orrin G. Judd* and *Robert McC. Marsh* for National Council of the Churches of Christ in the United States of America, *amicus curiæ*, in support of respondents' position. Released time religious education does not violate the constitutional provisions against establishment of religion and against State support of denominational schools. (*Lewis* v. *Board of Educ. of City of N. Y.*, 258 N. Y. 117.)

FROESSEL, J. This appeal challenges the constitutionality of the long-standing "released time" program in New York City, whereby parents may withdraw their children from the public schools one hour a week to receive religious instruction in the faith of their acceptance.

For many years released time existed in this State without express statutory authority. Then in 1940, the State Legislature, by an almost unanimous vote and with the approval of Governor Lehman (1940 Public Papers of Governor Lehman, p. 328), added (L. 1940, ch. 305) to the Education Law, which governs, among other things, the attendance of minors in schools, the following provision: "Absence for religious observance and education shall be permitted under rules that the commissioner [of education] shall establish."

Pursuant to this provision, which is now found in paragraph b of subdivision 1 of section 3210 of the Education Law, the State Commissioner of Education has promulgated the following rules (Regulations of Comr. of Educ., art. 17, § 154; 1 N. Y. Official Compilation of Codes, Rules and Regulations, p. 683):

" 1. Absence of a pupil from school during school hours for religious observance and education to be had outside the school building and grounds will be excused upon the request in writing signed by the parent or guardian of the pupil.

" 2. The courses in religious observance and education must be maintained and operated by or under the control of duly constituted religious bodies.

" 3. Pupils must be registered for the courses and a copy of the registration filed with the local public school authorities.

" 4. Reports of attendance of pupils upon such courses shall be filed with the principal or teacher at the end of each week.

" 5. Such absence shall be for not more than one hour each week at the close of a session at a time to be fixed by the local school authorities.

" 6. In the event that more than one school for religious observance and education is maintained in any district, the hour for absence for each particular public school in such district shall be the same for all such religious schools."

Additional rules have been established by the New York City Board of Education:

" 1. A program for religious instruction may be initiated by any religious organization, in cooperation with the parents of pupils concerned. There will be no announcement of any kind in the public schools relative to the program.

" 2. When a religious organization is prepared to initiate a program for religious instruction, the said organization will notify parents to enroll their children with the religious organization, and will issue to each enrolled pupil a card countersigned by the parent and addressed to the principal of the public school, requesting the release of the pupil from school for the purpose of religious instruction at a specific location. The said cards will be filed in the office of the public school as a record of pupils entitled to be excused, and will not be available or used for any other purpose.

" 3. Religious organizations, in cooperation with parents, will assume full responsibility for attendance at the religious center and will file with the school principal, weekly, a card attendance record and in cases of absence from religious instruction, a statement of the reason therefor.

" 4. Upon the presentation of a proper request as above prescribed, pupils of any grade will be dismissed from school for the last hour of the day's session on one day of each week to be designated by the Superintendent of Schools: A different day may be designated for each borough.

" 5. Pupils released for religious instruction will be dismissed from school in the usual way and the school authorities have no responsibility beyond that assumed in regular dismissals.

" 6. There shall be no comment by any principal or teacher on the attendance or non-attendance of any pupil upon religious instruction."

Appellants, parents of children attending public schools in New York City who do not avail themselves of this program and are in nowise obliged to do so, challenge by this article 78 proceeding the constitutionality of the foregoing statute and rules *in toto,* upon the ground that they violate the prohibition against laws respecting an establishment of religion contained in the First Amendment of the Federal Constitution, as applied to the States by the Fourteenth Amendment, and prohibit the free exercise of religion in violation of the First and Fourteenth Amendments of the Federal Constitution and section 3 of article I of our State Constitution. The courts below have denied them relief and dismissed the proceeding.

In support of their contention, appellants rely primarily on *Illinois ex rel. McCollum* v. *Board of Educ.* (333 U. S. 203). There, a local board of education in Champaign County, Illinois, participated in a released time program which differed radically from the one before us. There was no underlying State enabling act. Religious training took place in the school buildings and on school property. The place for instruction was designated by the school authorities. Pupils taking religious instruction were segregated by school authorities according to faiths. School officials supervised and approved the religious teachers. Pupils were solicited in school buildings for religious instruction. Registration cards were distributed by the school, and in one case printed by the school. None of these factors is present in the case before us, and, accordingly, the Supreme Court's holding that the Champaign released time program was constitutionally invalid is not controlling here.

In the New York City program there is neither supervision nor approval of religious teachers and no solicitation of pupils or distribution of cards. The religious instruction must be outside the school building and grounds. There must be no announcement of any kind in the public schools relative to the program and no comment by any principal or teacher on the attendance or nonattendance of any pupil upon religious instruc-

tion. All that the school does besides excusing the pupil is to keep a record — which is not available for any other purpose — in order to see that the excuses are not taken advantage of and the school deceived, which is, of course, the same procedure the school would take in respect of absence for any other reason.

It is manifest that the *McCollum* case (*supra*) is not a holding that all released time programs are *per se* unconstitutional. The Supreme Court's decision is limited to the fact situation before it. Thus, Mr. Justice BLACK, writing for the court, reviewed the evidence so far as undisputed and stated (p. 209) that the " foregoing *facts* " (emphasis supplied) " show the use of tax-supported property for religious instruction and the close cooperation between the school authorities and the religious council in promoting religious education."

In the instant case, there is no " use " of tax-supported " property or credit or any public money " " directly or indirectly " " in aid or maintenance " of religious instruction (*People ex rel. Lewis* v. *Graves,* 245 N. Y. 195, 198, motion for reargument denied 245 N. Y. 620, affg. 219 App. Div. 233, affg. 127 Misc. 135), and there is no such co-operation as in the *McCollum* case (*supra*) between the school authorities and the religious committee in promoting religious education.

Other Justices who wrote in the *McCollum* case (*supra*) were even more explicit in placing boundaries on the determination. Mr. Justice FRANKFURTER, in a concurring opinion in which three other Justices joined, stated:

" Of course, ' released time ' as a generalized conception, undefined by differentiating particularities, is not an issue for Constitutional adjudication." (P. 225.)

" The substantial differences among arrangements lumped together as ' released time ' emphasize the importance of detailed analysis of the facts to which the Constitutional test of Separation is to be applied. How does ' released time ' operate in Champaign? " (P. 226.)

" We do not consider, as indeed we could not, school programs not before us which, though colloquially characterized as ' released time,' present situations differing in aspects that may well be constitutionally crucial. Different forms which ' released time ' has taken during more than thirty years of

growth include programs which, like that before us, could not withstand the test of the Constitution; others may be found unexceptionable." (P. 231.)

Mr. Justice JACKSON, in addition to agreeing with the limitations expressed by Mr. Justice FRANKFURTER, added reservations of his own, and stated: " we should place some bounds on the demands for interference with local schools that we are empowered or willing to entertain " (p. 232), and that " it is important that we circumscribe our decision with some care." (P. 234.)

Mr. Justice REED, who dissented from the court's holding, pointed out (pp. 239–240) that expressions in the opinions of his colleagues " seem to leave open for further litigation variations from the Champaign plan." Thus, in addition to the reference in the court's opinion to the " foregoing facts " of the Champaign plan as showing its unconstitutionality, we have five other Justices expressly agreeing that released time as such is not unconstitutional.

Binding precedent must therefore be found in our own decision of nearly twenty-five years ago in *People ex rel. Lewis* v. *Graves (supra)*, which involved a released time program in the city of White Plains. Such program, except for the absence of a State enabling act, was substantially the same as the one now in issue. Judge POUND, writing for a unanimous court, its other distinguished members having been Chief Judge CARDOZO, and Judges CRANE, ANDREWS, LEHMAN, KELLOGG and O'BRIEN, there said (p. 198, 199):

" A child otherwise regular in attendance may be excused for a portion of the entire time during which the schools are in session, to the extent at least of half an hour in each week, to take outside instruction in music or dancing without violating the provisions of the Compulsory Education Law, either in letter or spirit. Otherwise the word ' regularly ' as used in the statute would be superfluous. Practical administration of the public schools calls for some elasticity in this regard and vests some discretion in the school authorities. Neither the Constitution nor the law discriminates against religion. Denominational religion is merely put in its proper place outside of public aid or support. * * *

" The separation of the public school system from religious denominational instruction is thus complete. Jealous sectaries may view with alarm the introduction in the schools of religious teaching which to the unobservant eye is but faintly tinted with denominationalism. Eternal vigilance is the price of constitutional rights. But it is impossible to say, as matter of law, that the slightest infringement of constitutional right or abuse of statutory requirement has been shown in this case."

To like effect are *Gordon* v. *Board of Educ. of City of Los Angeles* (78 Cal. App. 2d 464, review denied 78 Cal. App. 2d 481) and *Matter of Lewis* v. *Spaulding* (193 Misc. 66, appeal withdrawn 299 N. Y. 564).

Two years before our decision in the first *Lewis* case, it had been " assumed " by the Supreme Court that freedom of speech and of the press, likewise guaranteed by the First Amendment, were protected by the due process clause of the Fourteenth Amendment (*Gitlow* v. *New York,* 268 U. S. 652, 666), and, while the appellant in the *Lewis* case laid greater stress on section 4 of article IX (now art. XI, § 4) of the New York Constitution, he expressly urged in his petition the violation " of the constitutional guarantees of the New York State and the United States Constitutions respecting religious liberty and the separation of church and state ". Nevertheless we held that the released time program did not breach the so-called " wall of separation " between church and state.

No metaphorical " wall " that mere words can build ever precisely and mathematically delineates a constitutional right. The Supreme Court has recognized, in a religious freedom case, that to " make accommodation between these freedoms " guaranteed by the First Amendment and " an exercise of state authority " is always " delicate " (*Prince* v. *Massachusetts,* 321 U. S. 158, 165). Such freedoms are not absolute (*Prince* v. *Massachusetts, supra,* p. 166; *Dennis* v. *United States,* 341 U. S. 494; *Breard* v. *Alexandria,* 341 U. S. 622; *Schenck* v. *United States,* 249 U. S. 47). Numerous situations involving some incidental benefit to religion have been found constitutionally unexceptionable (see, e.g., *Everson* v. *Board of Educ.,* 330 U. S. 1; *Cochran* v. *Louisiana State Bd. of Educ.,* 281 U. S. 370; *Bradfield* v. *Roberts,* 175 U. S. 291). Tax

exemption of church properties (Tax Law, § 4, subd. 6) is but another of many illustrations, and the practice is generally followed. Very recently, in upholding the Sunday law, we have recognized that separation of church and State does not mean that every State action remotely connected with religion must be outlawed (*People* v. *Friedman,* 302 N. Y. 75, appeal dismissed for want of a substantial Federal question, 341 U. S. 907).

It is thus clear beyond cavil that the Constitution does not demand that every friendly gesture between church and State shall be discountenanced. The so-called "wall of separation" may be built so high and so broad as to impair both State and church, as we have come to know them. Indeed, we should convert this "wall", which in our "religious nation" (*Church of Holy Trinity* v. *United States,* 143 U. S. 457, 470) is designed as a reasonable line of demarcation between friends, into an "iron curtain" as between foes, were we to strike down this sincere and most scrupulous effort of our State legislators, the elected representatives of the People, to find an accommodation between constitutional prohibitions and the right of parental control over children. In so doing we should manifest "a governmental hostility to religion" which would be "at war with our national tradition" (*Illinois ex rel. McCollum* v. *Board of Educ., supra,* p. 211) and would disregard the basic tenet of constitutional law that "the public interests imperatively demand — that legislative enactments should be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of the Constitution" (*Atkin* v. *Kansas,* 191 U. S. 207, 223).

While extreme care must, of course, be exercised to protect the constitutional rights of these appellants, it must also be remembered that the First Amendment not only forbids laws "respecting an establishment of religion" but also laws "prohibiting the free exercise thereof". We must not destroy one in an effort to preserve the other. We cannot, therefore, be unmindful of the constitutional rights of those many parents in our State (we are told that some 200,000 children are enrolled in the released time programs in this jurisdiction, and ten times as many throughout the nation) who participate in and subscribe

to such programs. The right of parents to direct the rearing and education of their children, free from any general power of the State to standardize children by forcing them to accept instruction from public school teachers only, is an unquestioned one (*Pierce* v. *Society of Sisters,* 268 U. S. 510), and, more recently, the nation's highest judicial tribunal has declared: " It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder " (*Prince* v. *Massachusetts, supra,* p. 166).

Because the public school must be kept separate and apart from the church, pupils may not constitutionally receive religious instruction therein. All that New York parents ask then is that their children may be excused one hour a week for that purpose. The New York City Board of Education provides more days for secular instruction than required by law (Education Law, § 3204, subd. 4). The Education Law does not fix the number of hours that constitute a school day. Excuses from attendance are permitted for many good reasons; among others, children are excused from school on holy days set apart by their respective faiths, thus producing a most obvious form of divisiveness, not paralleled in the released time program. Indeed we are all agreed that refusal to excuse children for that reason would be an unconstitutional abridgement of freedom of religion. If it be constitutional to excuse children of a particular faith for entire days for such a religious purpose, it seems clear, by a parity of reasoning, that it is also constitutional, under the circumstances here presented, to excuse children of whatever faith one hour a week for another and similar religious purpose. The statute (Education Law, § 3210, subd. 1, par. b) authorizes absence for both " religious observance and education ".

Moreover, parents have the right to educate their children elsewhere than in the public schools, provided the State's minimum requirements are met (Education Law, § 3204; *Pierce* v. *Society of Sisters, supra*), and thus, if they wish, choose a religious or parochial school where religious instruction is freely given. That being so, it follows that parents, who desire to have their children educated in the public schools but to

withdraw them therefrom for the limited period of only one hour a week in order to receive religious instruction, may ask the public school for such permission, and the school may constitutionally accede to this parental request. There is nothing in the Constitution commanding that religious instruction may be given on the Sabbath alone, and on no other day.

Appellants assert that in any event triable issues of fact are presented. A basic difficulty with this contention is that appellants now declare that they are prepared to show on a trial matters that have not even been properly pleaded. A great many of their allegations are conclusory in character (*Kalmanash* v. *Smith*, 291 N. Y. 142, 154), and, as appellants concede, have been lifted bodily from portions of the *McCollum* opinions, without the statement of adequate facts to support them (Civ. Prac. Act, § 1288). As the Appellate Division said, '' if the truth of all of the *well-pleaded* allegations of the petition is conceded, petitioners have failed to allege *facts* sufficient to establish any invasion of their constitutional rights '' (emphasis supplied; 278 App. Div. 573, 575).

Moreover, many of the conclusory allegations suggest merely a disobedience of the rules and regulations. Such disobedience, while it might warrant the initiation of disciplinary proceedings against any of the offending teachers or principals, would in nowise warrant the relief prayed for, namely, a total discontinuance of the released time program and a rescission of all regulations established by the authorities. It is, of course, possible that a statute and regulations constitutional on their face may be administered in an unconstitutional way (*Snowden* v. *Hughes*, 321 U. S. 1; *Yick Wo* v. *Hopkins*, 118 U. S. 356), but in order to invoke this principle it must appear that there is '' an element of intentional or purposeful discrimination '' by the enforcement authorities (*Snowden* v. *Hughes, supra,* p. 8). Here there is no allegation in the petition to that effect, and, indeed, even in appellants' brief and in the briefs *amici* supporting their position, '' The offer of proof was not an offer to show a pattern of discrimination consciously practiced '' (*People* v. *Friedman, supra,* p. 81). Under the circumstances, whether the released time program is constitutional is solely a question of law, and the case has been so treated by Special

Term as well as by the Appellate Division majority and dissenters.

The order of the Appellate Division should be affirmed, with costs.

LOUGHRAN, Ch. J. (concurring). I vote to affirm the order of the Appellate Division upon the authority of *People ex rel. Lewis* v. *Graves* (245 N. Y. 195).

DESMOND, J. (concurring). This is a mandamus-type proceeding (Civ. Prac. Act, art. 78) brought to compel the New York City Board of Education and the State Commissioner of Education, to discontinue and abolish the so-called " released time program " in the city's public schools, on the alleged ground that the release of children from those schools, for one hour a week, at the request of parents, to attend outside religious instruction in their several faiths, violates the Federal Constitution as to its First Amendment, made applicable to the States by the Fourteentin Amendment. Specifically, it is the contention of petitioners that the program as conducted in New York City, and the State statute and State and local regulations under which it operates, " are violative of the U. S. Constitution within the principles set forth in the *McCollum* decision " that is, *Illinois ex rel. McCollum* v. *Board of Educ.* (333 U. S. 203). I vote for affirmance, because I see no basis for any claim of unconstitutionality.

The First Amendment, which is not quoted at any place in the petition or in the briefs of petitioners and their supporters, forbids the making of laws " respecting an establishment of religion, or prohibiting the free exercise thereof ". Neither of those prohibitions, in language or meaning, has anything whatever to do with this released time system. The *McCollum* case (*supra*), is not controlling on us here, since the Champaign, Illinois plan, there struck down as unconstitutional, differed from the New York program in a number of important respects, principally in that religious training took place in the classrooms of the Champaign public schools (one of the " chief reasons " for the decision, says Justice JACKSON in a note in the *Kunz* v. *New York* dissent, 340 U. S. 290, 311), some public funds were spent in Champaign, the religious teachers there were chosen with the approval of the public school officials, and pupils were, in the Champaign school buildings, solicited for religious

instruction. If we are to decide this case on precedent, we must follow our own decision in *People ex rel. Lewis* v. *Graves* (245 N. Y. 195), where we upheld, as against claims that it contravened both the Federal and State Constitutions, a released time plan identical with the one now before this court. It must be conceded, of course, that there are, scattered through the several lengthy opinions in *McCollum,* expressions which can be read to proscribe all released time programs, including this one. But *stare decisis* does not mean *stare verbis,* and until the New York plan, or one just like it, confronts the Supreme Court, there will be no precedent binding on us.

Before turning to a somewhat more thorough discussion of the constitutional question, I mention another separate ground for affirmance. Petitioners are, according to the petition, the parents of pupils in New York City schools where this plan operates. Their children do not take part in the program but each receives religious instructions at religious schools, outside public school hours. It is indeed difficult to see how the release of other parents' children impinges in any way at all, on any " right " of petitioners. True, they allege that the operation of the released time program " inevitably results " in coercion on parents and children to attend religious instruction, but it is clear that no such " inevitable " result has befallen petitioners or their children. The *Lewis* case (*supra*) in this court can, I suppose, be read as holding that these petitioners, as citizens, have standing to bring this mandamus proceeding, but I suggest the point will bear reinvestigation. It is farfetched to say that petitioners are aggrieved by the continuance of a program which has no effect on them or their children, and which does not involve the use of public buildings, property or funds.

I return to the alleged constitutional question, which needs must be one under the Federal Bill of Rights, since an extramural religious education project, just like this one, was expressly held, in the *Lewis* case (*supra*), not to be interdicted by our State Constitution (art. XI, § 4). Our duty then (unhampered by *McCollum* which is not controlling) is to lay the plain facts of this released time system over against the plain words of the First Amendment. The amendment, lavishly alluded to but seldom quoted, bans, in lucid, specific words, the making

of any law " respecting an establishment of religion, or prohibiting the free exercise thereof ". The New York released time setup is authorized by a statute (Education Law, § 3210), which permits absences from public schools " for religious observance and education", under rules to be established by the State Commissioner. In approving its passage, Governor Lehman, whose devotion to constitutional liberties needs no encomium, characterized as groundless the fears expressed by some that it " violates principles of our government " and stated: " The bill does not introduce anything new into our public school system nor does it violate the principles of our public educational system " (1940 Public Papers of Governor Lehman, p. 328). The regulations adopted by the State Education Commissioner, and by respondent New York City board (taking both sets of regulations together) excuse the absence from school, for one hour a week at the close of a daily session, of any pupil, whose absence is requested by his parent or guardian for attendance at, and, who does attend, a religious education course conducted under the control of one or more duly constituted religious bodies, each such pupil to be registered for the religious course with, and his attendance thereat reported to, the public school authorities, no announcement of any kind relative to the program to be made in the public school, but notification to come to parents from the religious organization only, no comment to be made by any principal or teacher of attendance or nonattendance of any pupil at the religion classes, and no responsibility for attendance thereat to be assumed by the public school but solely by the religious organizations, which, co-operating with parents, must file with the public school principal weekly, a statement of attendance at, or absence from the religion classes, of any pupil enrolled in the latter, with a statement of reasons for absences therefrom. Just where in all that is there " an establishment of religion " or a prohibition of " the free exercise thereof "? Characterization of such a program as " divisive " or " oppressive " or " coercive " is meaningless on a question of constitutional law. What petitioners are saying is that they dislike the whole enterprise, and consider it socially undesirable. Those are predilections, not questions of law.

The basic fundamental here at hazard is not, it should be made clear, any so-called (but nonexistent, as I shall try to show) " principle " of complete separation of religion from government. Such a total separation has never existed in America, and none was ever planned or considered by the founders. The true and real principle that calls for assertion here is that of the right of parents to control the education of their children, so long as they provide them with the State-mandated minimum of secular learning, and the right of parents to raise and instruct their children in any religion chosen by the parents (*Pierce* v. *Society of Sisters,* 268 U. S. 510; *Meyer* v. *Nebraska,* 262 U. S. 390; *Packer Collegiate Inst.* v. *University of State of N. Y.,* 298 N. Y. 184, 192). Those are true and absolute rights under natural law, antedating, and superior to, any human constitution or statute.

I cannot believe that the Chief Justice of the United States, in his opinion for the Supreme Court majority in *Dennis* v. *United States* (341 U. S. 494, 508), meant, literally, what he wrote: " that there are no absolutes " and that " all concepts are relative ". Of course, even the constitutional rights of freedom of speech and freedom of religion are, to a degree, nonabsolute, since their disorderly or dangerous exercise may be forbidden by law. But embodied within " freedom of religion " is a right which is absolute and not subject to any governmental interference whatever. Absolute, I insist, is the right to practice one's religion without hindrance, and that necessarily comprehends the right to teach that religion, or have it taught, to one's children. That anything in the United States Constitution means, or could ever be tortured into meaning, that our basic law is violated by an arrangement whereby parents take their own children from the common schools, for one hour a week for instruction in their religion, is beyond my comprehension. As Dean Pound has lately reminded us, our American bills of rights " in their significant provisions are bills of liberties " (New Paths of the Law, p. 7). The New York released time system is a mere method for the exercise of the religious liberties of the parents of public school pupils, and infringes on no rights of anyone, since no one else's rights are in any way affected.

By what process, then, in the teeth of those fundamentals, is an argument contrived for the proposition that this release of children from secular schools for religious education amounts to "an establishment of religion" or prohibits the free exercise thereof? The answer is: the argument construes the First Amendment by ignoring its language, its history and its obvious meaning, and by substituting, for its plain wording, and intendment, the metaphor (FRANKFURTER, J., in the *McCollum* case, 333 U. S. 203, 231, *supra*) or loose colloquialism of "a wall between church and State". That the "wall" has never been more than a figure of speech, is clear from the context in which it was first used by Jefferson (see as quoted by Justice REED in the dissent in *Illinois ex rel. McCollum* v. *Board of Educ., supra*, p. 245, n.). Quite recently, the Supreme Court itself, in two of its careful opinions in the *Dennis* case (*supra*), has warned us against encasing truth in a "semantic straitjacket" (Chief Justice's opinion, p. 508) or attempting to decide great constitutional issues by the use of a "sonorous formula" (concurring opinion of Justice FRANKFURTER, p. 519). To dispose of this "unbreachable wall" or "impassable gulf" idea, we need only apply here the simple, lucid test proposed by Justice FRANKFURTER in that same *Dennis* opinion: "not what words did Madison and Franklin use, but what was in their minds which they conveyed?" (P. 523.) What was in the minds of the founders is writ as large and plain as anything on history's pages, and there is not the slightest possible warrant for ascribing to them an intent to interfere (in the guise of a "Bill of Rights"!), with parents' religious indoctrination of their own children.

One of the curiosities of history is the enlarged and distorted meaning currently being given, by some, to the simple phrase of the First Amendment: "an establishment of religion". It must be the rule as to constitutions, just as to statutes, that there is "no occasion for construction" when the phrasing "is entirely free from ambiguity" (*Wright* v. *United States*, 302 U. S. 583, 589; 1 Cooley's Const. Limitations [8th ed.], pp. 124–126; *Matter of Carey* v. *Morton*, 297 N. Y. 361, 366). The language of a constitution is to be given its ordinary meaning (*Wright* v. *United States*, and *Matter of Carey* v. *Morton*,

*supra*). The fundamental purpose in construing it is to ascertain and give effect to the intent of the framers and of the people who adopted it, keeping in mind the objects sought to be accomplished and the evils sought to be prevented or remedied. Under any or all those rules and tests (and they are all one), what is the meaning of " an establishment of religion "? The Supreme Court itself gave us the answer in *Cantwell* v. *Connecticut* (310 U. S. 296, 303) : " it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship." " Established " churches were well known to the colonists, who had experienced them in Europe and America. They knew that the phrase meant " a state church, such as for instance existed in Massachusetts for more than forty years after the adoption of the Constitution " (Corwin, Constitution and What it Means Today [9th ed.], pp. 155-156). When the Constitution was adopted there were still established churches in five of the States, and a few years earlier there had been nine of them in the thirteen colonies (O'Neill, Religion and Education under the Constitution, p. 97). " Establishment " of a church or religion always and necessarily means an act of government favoring one particular church or group of churches. Historically, that is exactly what the amendment meant to the framers of the Constitution and to the Congress and the people who adopted it. Despite all the " historical " gloss, there is one only exposition in the Annals of Congress of the meaning, and no contemporary proofs to the contrary. Madison, the author, said during the First Congress (Annals of Congress for August 15, 1789, Vol. 1, p. 758) that the amendment mandated: " that Congress should not establish a religion, and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience ". The necessity for the amendment, he went on to say, was a fear by some that Congress might otherwise have power to " make laws of such a nature as might infringe the rights of conscience, and establish a national religion " and he repeated that the amendment was intended " to prevent these effects ". Finally, he noted that the amendment was being added because " the people feared one sect might obtain a pre-eminence, or two combine together, and establish a religion to which they would compel others to conform ". Such fears had indeed been expres-

sed during the campaign to ratify the Constitution as originally drawn (see Van Doren, The Great Rehearsal, pp. 217, 237). No one at that time, or for years thereafter, so far as I can discover, ever attributed to the First Amendment any broader meaning. It is inconceivable that it was ever meant to prohibit governmental encouragement of, or cooperation with, religions generally. As Judge STORY pointed out in his Commentaries (Vol. II [5th ed.], pp. 630-631) the " general if not the universal sentiment in America was, that Christianity ought to receive encouragement ".

I realize that much broader scope may seem to have been accorded to the First Amendment, by the Supreme Court, in the *Everson* v. *Board of Educ.* (330 U. S. 1) and *McCollum* decisions. But if such a broadening was intended in *McCollum* and *Everson* (*supra*), it has, I say with respect, no basis in the only history which is pertinent: the history of the drafting and adoption of the amendment itself. Indeed, that seems to have been conceded by the Justices who were in the majority in the *McCollum* case (see Justice FRANKFURTER, concurring, pp. 217–220 of 333 U. S.). So experienced and proficient a modern commentator as Charles P. Curtis says, while approving the *McCollum* holding, that the court reached its decision without " any justification whatever in what the Constitution says, and even less in what those who wrote it intended it to mean " (Curtis, Modern Supreme Court, Vanderbilt L. Rev., Vol. 4, No. 3, p. 438). Indeed, Curtis surmises " that the First Congress would have rephrased the First Amendment to exclude the release of school time for religious teaching, if it had then been one of the issues of the day." The surmise is not a particularly daring one, as to those early Americans, nearly all of whose schools were religious in spirit and foundation, and who then, or just before or after, invoked the Deity in their Declaration of Independence, established chaplaincies, expressed their trust in God on their coins, and sang " America " part of which is a prayer to God to " protect us by Thy might ". The spirit of those times was that of Washington telling us in his Farewell Address that national morality cannot " prevail in exclusion of religious principle " and Edmund Burke, across the sea, warning that " religion is the basis of civil society, and

the source of all good and comfort ''. (Reflections on the Revolution in France.) Mr. Curtis says that *Everson* and *McCollum* represent judicial work '' wise and well done '' but his reason for that personal judgment is that he thinks that '' such a use of release time would have a bad effect on our public schools '' inculcating a feeling of separatism, etc. Perhaps so, but what has all that to do with the Constitution, and is it anything more than a disguised plea that the court be allowed to rewrite or amend the Constitution, to accomplish what seems, at the moment and to the incumbents, the better social policy?

Learned writers on law justify this sort of constitutional exegesis, and urge that '' a written constitution, which is frequently thought to give rigidity to a system, must provide flexibility if judicial supremacy is to be permitted '' (Levi, An Introduction to Legal Reasoning, p. 42). Rejected by them is the suggestion that '' the interpretation ought to remain fixed in order to permit the people through legislative machinery, such as the constitutional convention, or the amending process, to make a change '' (Levi, *id.*). The answer, says the same author, is that '' a written constitution must be enormously ambiguous in its general provisions ''. General and sweeping, yes. But not ambiguous. Being a constitution, it should state basic law in broadest outline, available for specific applications as needed. But it cannot, I suggest, be ambiguous and be at the same time a constitution. And, regardless of all this, a particular constitution may use definite, one-shot, one-meaning words, and when such are found, as we find them here in the First Amendment, no process of legal reasoning can make them mean something else, or serve some new and unintended purpose.

Petitioners, lacking support in precedent or history, fall back on assertions that this released time method gives religion '' active cooperation '' and '' aid in obtaining pupils '' for the off-campus religious classes. If proof of such co-operation, aid and encouragement could lead to a conclusion of law that the scheme is unconstitutional, then a trial of those allegations would be in order, and the dismissal of the petition below, without a trial, would be wrong. But governmental aid to, and

encouragement of, religions generally, as distinguished from establishment or support of separate sects, has never been considered offensive to the American constitutional system. If they are inimical to our fundamental law, then every President has offended by invoking the Deity in his oath of office, by issuing Thanksgiving proclamations and calling on our people to pray for victory in war, or for peace, or for our soldiers' safety. If petitioners are right, then there is a violation every time a chaplain opens a Congressional session with prayer, or an army bugler sounds " Church call ". If petitioners are right, then the Pilgrims were wrong, as was every President who officially urged our people to train themselves in, and practice, religion. Our own State Constitution, on petitioners' theory, offends against American constitutionalism at the point in its preamble where it expresses gratitude " to Almighty God " for our freedom. Petitioners would have this court now deny the declarations of the Supreme Court in the *Church of Holy Trinity* v. *United States* case (143 U. S. 457) and of Chief Justice KENT in the *People* v. *Ruggles* case (8 Johns. 290) in 1811, that ours is a religious nation. I stand on Chief Justice KENT's declaration, long ago in the *Ruggles* case (p. 296), that the Constitution " never meant to withdraw religion in general, and with it the best sanctions of moral and social obligation, from all consideration and notice of the law."

The order should be affirmed, with costs.

FULD, J. (dissenting). On federal constitutional questions, the Supreme Court of the United States is, of course, the final arbiter, and, concerning the impact of the First Amendment upon religious instruction and the public school, it has recently spoken. That Amendment, the Supreme Court declared, " rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere. * * * the First Amendment has erected a wall between Church and State which must be kept high and impregnable." (*Illinois ex rel. McCollum* v. *Board of Education*, 333 U. S. 203, 212.) In the light of that principle, the court ruled, the Amendment prevents the passage of any laws " which aid one religion, aid all religions, or prefer one religion over another." (*Illinois ex rel. McCollum* v. *Board*

*of Education, supra,* 333 U. S. 203, 210; *Everson* v. *Board of Education,* 330 U. S. 1, 15.)

Drawing authority and direction from section 3210, subdivision 1b, of the Education Law, as amended in 1940, and rules and regulations promulgated by the New York State Commissioner of Education (Regulations of Comr. of Educ., art. 17, § 154; 1 N. Y. Official Compilation of Codes, Rules and Regulations, p. 683), the New York City Board of Education has made provision for a plan of religious instruction by individual sects for the training of public school students. The instruction is given on public school time, but not on public school property. The rules direct that, upon the written request to the school by a parent and a '' duly constituted religious body '' '' prepared to initiate a program for religious instruction,'' a child is to be released from his regular classes for such instruction for one hour a week; and the public schools are required to maintain records of attendance at these religious courses and of the reasons for absence therefrom. Those children whose parents do not wish them to attend or whose religious sect has not set up a program of instruction in co-operation with the public school's regimen are kept in school to receive what the Superintendent of Schools of the City of New York refers to as '' significant education work ''.

Petitioners challenge that program as a breach of the wall of separation erected by the First Amendment. Their standing is not questioned by respondents and many of the allegations of their petition are not disputed. They are United States citizens, residents, taxpayers and property owners in Kings County and parents of children attending public schools in the Borough of Brooklyn, New York City, where the '' released time '' program is in operation. Their children do not utilize that program, but instead receive regular religious instruction outside of public school hours at religious schools of their respective faiths — Zorach's child at a Protestant Episcopal religious school and Gluck's children at a Jewish religious school. Asserting that other children in the public schools are released regularly from classes for one hour each week on condition that they attend courses for sectarian religious instruction at religious centers, petitioners seek an order directing the State Commissioner and the City Board to discontinue the program and rescind their regulations.

Denied, but deemed admitted for the purposes of this motion to dismiss the petition (see, e.g., *Matter of Hines* v. *State Bd. of Parole*, 293 N. Y. 254, 258; *Matter of Schwab* v. *McElligott*, 282 N. Y. 182, 185–186), are the further allegations of the petition that the Greater New York Coordinating Committee on Released Time of Jews, Protestants and Roman Catholics " cooperates closely with the public school authorities " in managing the program and in " promoting religious instruction "; that " the system necessarily entails use of the public school machinery and time of public school principals, teachers and administrative staff "; that " the compulsory education system * * * assists and is integrated with the program of sectarian religious instruction carried on by separate religious sects "; that it " has resulted and inevitably results in the exercise of pressure and coercion upon parents and children to secure attendance by the children for religious instruction "; that it " has resulted and inevitably will result in divisiveness because of difference in religious beliefs and disbeliefs "; and that " limiting " participation in the " program to ' duly constituted religious bodies ' effects an unlawful censorship of religion and preference in favor of certain religious sects."

In its present posture, the case before us presents the simple question whether the program just described is infected with the same constitutional infirmity that the United States Supreme Court found in *Illinois ex rel. McCollum* v. *Board of Education* (*supra,* 333 U. S. 203). And, though it is ultimately upon the meaning of the First Amendment that the answer to that question depends, we are no longer free since the *McCollum* decision to place our own meaning or gloss upon that Amendment, but must read it as has the Supreme Court.

While the Champaign " released time " system which was condemned in that case differed in details from that here complained of, the court's conclusion and the principles which it enunciated are broad in scope and clearly reach far beyond the precise fact situation there presented.

In fixing upon the exact holding of the Supreme Court, there may be room for argument as to which phrase, separated from context, best reflects the sense to be distilled from the several opinions written, but there can be no doubt whatsoever as to the

net result. Mr. Justice REED, dissenting alone, recorded the common ground and ultimate conclusion of his brethren's opinions with the statement (333 U. S., at p. 240): "From the tenor of the opinions I conclude * * * that *any use of a pupil's school time, whether that use is on or off the school grounds, with the necessary school regulations to facilitate attendance, falls under the ban.*" (Emphasis supplied.)

Regarding the principles enunciated by the court, the first tenet was that the First Amendment has erected a wall "high and impregnable" between Church and State and that the state must maintain a strict neutrality, neither suppressing nor supporting religion. Speaking for a majority of six judges, Mr. Justice BLACK wrote (333 U. S., at pp. 210–211): "Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. * * * In the words of Jefferson, the clause against establishment of religion by law was intended to erect ' a wall of separation between church and State.' "

That wall was breached by the released time program in Champaign, according to the court, since by it the state effectively aided religion in two respects — (1) by making the public school buildings available and (2) by providing pupils for this or that sect's religious classes. Mr. Justice BLACK made this exceedingly plain in the following passages (pp. 209–210, 212):

" Pupils compelled by law to go to school for secular education are released in part from their legal duty upon the condition that they attend the religious classes. This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith. And it falls squarely under the ban of the First Amendment. [pp. 209–210]

* * *

" Here not only are the State's tax-supported public school buildings used for the dissemination of religious doctrines. The State also affords sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the State's compulsory public school machinery. This is not separation of Church and State. [p. 212] "

Not only by direct command, but also by the pressures inherent in the functioning of the program did the Champaign system effect a breach of the wall. " The Champaign arrangement ", Mr. Justice FRANKFURTER, concurring, said, " thus presents powerful elements of inherent pressure by the school system in the interest of religious sects. The fact that this power has not been used to discriminate is beside the point. * * * That a child is offered an alternative may reduce the constraint; it does not eliminate the operation of influence by the school in matters sacred to conscience and outside the school's domain. The law of imitation operates, and non-conformity is not an outstanding characteristic of children. The result is an obvious pressure upon children to attend " (p. 227).

It is not that the First Amendment begrudges the use of a portion of the school day for religious instruction that condemned the Champaign program. Rather, the objection was the utilization by state authority of the " momentum of the whole school atmosphere and school planning " behind released time: " If it were merely a question of enabling a child to obtain religious instruction with a receptive mind, the thirty or forty-five minutes could readily be found on Saturday or Sunday. If that were all, Champaign might have drawn upon the French system, known in its American manifestation as ' dismissed time,' whereby one school day is shortened to allow all children to go where they please, leaving those who so desire to go to a religious school. The momentum of the whole school atmosphere and school planning is presumably put behind religious instruction, as given in Champaign, precisely in order to secure for the religious instruction such momentum and planning. To speak of ' released time ' as being only half or three quarters of an hour is to draw a thread from a fabric " (per FRANKFURTER, J., concurring, 333 U. S., at pp. 230-231).

The statute, the regulations and the pleadings in the record before us similarly make plain the use of the state's compulsory public school machinery, its atmosphere and its momentum. The vice in the use of such machinery to provide pupils for the religious classes is as predominant a factor in the present case as it was in *McCollum* (333 U. S., at p. 212). As in

that case, so here, pupils compelled by law to go to school for secular education, *are released for an hour on condition that they attend religious classes.* Accordingly, there is no denying that the program enables religious denominations to divert to sectarian instruction pupils assembled, and time set aside, for secular education by the state's compulsory attendance laws. Moreover, while it is true that the regulations prohibit comment on a pupil's failure to attend the religious classes, the program itself seems bound to exert certain inherent pressures on the pupils to attend. For one thing, there results an inevitable feeling of " separatism " in pupils " left behind " — to avoid which, few will hesitate to conform to the practices of their fellow students (333 U. S., at p. 227). In addition, the release from the obligation to attend public school for the one hour a week is unquestionably an inducement to register for such courses, for, it has been observed, religious instruction can compete more successfully with arithmetic than with recreation.

The co-operation of the public school system further serves to assure the attendance at the religious classes of the pupils enrolled therein. The regulations require that " Reports of attendance of pupils upon such courses shall be filed with the principal or teacher at the end of each week ", together with a statement of the reason for any absence. Knowledge that an official record is kept of his attendance necessarily places pressure on the child — accustomed as he is to the discipline of school — to attend these religious classes.

Indeed, the entire vitality of the program lies in the prestige, planning, co-operation and assistance lent by the public school system, which is exactly that fusion and integration of state and religion prohibited by the First Amendment as interpreted by the Supreme Court. While, therefore, there may here be no use of public school buildings and — I am willing to assume — no use of public school funds and but little of the time of public school personnel, no one may dispute that the state affords sectarian groups " invaluable aid " in helping to provide pupils for their religious classes through the use of its compulsory public school machinery. This is more than a " friendly gesture " — the phrase is Judge FROESSEL's — between Church and State. If " Separation means separation,

not something less ", if the relation between Church and State is " a ' wall    *    *    * ' not    *    *    *    a fine line easily over-stepped " (per FRANKFURTER, J., concurring, 333 U. S., at p. 231), then, certainly, the New York City program violates the First Amendment.

And, as was true of the Champaign plan, so here in this case, the program is necessarily divisive in its effect. As Justice FRANKFURTER forcefully noted:

" Again, while the Champaign school population represents only a fraction of the more than two hundred and fifty sects of the nation, not even all the practicing sects in Champaign are willing or able to provide religious instruction. The children belonging to these non-participating sects will thus have inculcated in them a feeling of separatism when the school should be the training ground for habits of community, or they will have religious instruction in a faith which is not that of their parents. As a result, the public school system of Champaign actively furthers inculcation in the religious tenets of some faiths, and in the process sharpens the consciousness of religious differences at least among some of the children committed to its care. These are consequences not amenable to statistics. But they are precisely the consequences against which the Constitution was directed when it prohibited the Government common to all from becoming embroiled, however innocently, in the destructive religious conflicts of which the history of even this country records some dark pages. [pp. 227–228]

" Designed to serve as perhaps the most powerful agency for promoting cohesion among a heterogeneous democratic people, the public school must keep scrupulously free from entanglement in the strife of sects. The preservation of the community from divisive conflicts, of Government from irreconcilable pressures by religious groups, of religion from censorship and coercion however subtly exercised, requires strict confinement of the State to instruction other than religious, leaving to the individual's church and home, indoctrination in the faith of his choice. [pp. 216–217] "

Present a program where some children are released from their usual attendance at public school on condition that they attend courses in religious observance and education under the control of duly constituted religious bodies, it cannot matter,

insofar as the impact of the First Amendment is concerned, that such religious instruction is given off the school grounds. What is vital and operative is, not where the religious teaching is given, but that it secures its pupils through the instrumentality of the state and through the machinery and momentum of the public school system. No one disputes the power of the legislature to shorten the school day so as to afford greater opportunity for week-day religious instruction, but it may not go beyond that and lend its aid to coerce or encourage enrollment for such instruction. There is a vital distinction between coercion and what the court chooses to term " an accommodation " between " constitutional prohibitions and the right of parental control over children." (Opinion of Judge FROESSEL, *supra,* p. 172.)

In sum, then, what the First Amendment forbids is the fusing, through state action, of the secular and the sectarian in the field of public education. The circumstance that any sect may participate in the program is immaterial. It is not discrimination alone that the Constitution prohibits; as the Supreme Court made indisputably clear, neither the state nor its public schools may be used to " ' aid one religion, aid all religions, or prefer one religion over another.' " (333 U. S. 203, 210–211.)

I perceive no merit in the contention for which *Pierce* v. *Society of Sisters* (268 U. S. 510), is cited — that a challenge to the released time program is a challenge to the right of parents to control the rearing and education of their children. More specifically, it is urged that, if a parent may insist upon the complete " release " of a child from any attendance at a public school so as to permit him to pursue his studies in a parochial school, the parent has, *a fortiori,* a right to insist on the release of the child for but a small percentage of school time.

The argument goes too far. It assumes that, even though the child is enrolled in a public school, the parent has a constitutional right to remove him therefrom for any period and at any time for instruction in sectarian religious courses. The *Pierce* case stands for no such proposition. The Supreme Court there held only that the state cannot constitutionally prevent parents from determining for themselves where their children shall be educated and whether that education shall be sectarian or nonsectarian. No one questions the right of parents to send

their children to private or parochial schools of their own choosing. Parents do not, however, have any constitutional right to interfere with the functioning of the public school system or to demand that it serve as an adjunct to a plan of religious instruction. Moreover, what the *McCollum* case concerned itself with, and what is here involved, is not the right of a parent, but rather a basic limitation on the power of the state. The *McCollum* case, as we have noted, invoked the doctrine of separation, not against the parent's right, but against the state's power, and held that the state may not commingle a program of religious instruction with the secular education given in its public schools. Nothing in the *Pierce* case either negates that doctrine or suggests a contrary conclusion.

It may well be that there are children growing up untutored in matters religious and, if that be so, it is a matter for grave concern. Considerations of fundamental principle, however, are involved when an attempt is made to enable religious groups to cure that lack through the instrumentality of the public school. Our constitutional policy, it has been said, "does not deny the value or the necessity for religious training, teaching or observance. Rather it secures their free exercise. But to that end it does deny that the state can undertake or sustain them in any form or degree. For this reason the sphere of religious activity, as distinguished from the secular intellectual liberties, has been given the twofold protection and, as the state cannot forbid, neither can it perform or aid in performing the religious function. The dual prohibition makes that function altogether private. It cannot be made a public one by legislative act. This was the very heart of Madison's Remonstrance, as it is of the [First] Amendment itself.

"It is not because religious teaching does not promote the public or the individual's welfare, but because neither is furthered when the state promotes religious education, that the Constitution forbids it to do so." (RUTLEDGE, J., dissenting in *Everson v. Board of Educ., supra,* 330 U. S., at p. 52.)

Nor may the released time program be justified as merely another application of the immemorial and unchallenged prac-

tice of releasing children from school attendance to permit them to observe their religious Holy Days. The suggested analogy confuses two entirely different and distinct matters. Religious observance of Holy Days necessarily requires attendance at church or temple at stated times which may coincide with the hours otherwise prescribed by law for school attendance. To refuse to excuse children for such religious observance would be a restraint of that freedom of religion, an interference with that liberty of worship, which the Constitution guarantees. (Cf. *West Virginia State Bd. of Educ.* v. *Barnette,* 319 U. S. 624, *passim.*) Obviously, no such issue is here involved.

*People ex rel. Lewis* v. *Graves* (245 N. Y. 195), upon which respondents heavily rely, did involve a scheme for released time for religious instruction somewhat similar to the one before us: on the written request of the parent alone — and not, as in this case, by a clergyman of a " duly constituted religious body " as well — the child was released for a half hour a week of what would normally have been a study session at school. However, in view of the Supreme Court's interpretation in the *McCollum* case of the controlling First Amendment, the *Lewis* case can no longer be deemed decisive, and no useful purpose is served by considering whether an appraisal of the factual differences between the New York City program and the White Plains program in the *Lewis* case would make the *Lewis* decision inapplicable even under the Constitution of New York State. In addition, and I mention it in passing, the petitioner in the *Lewis* case relied upon article IX, section 4 (now art. XI, § 4) of the State Constitution, and neither the court nor any of the parties even referred to the constitutional provision (art. I, § 3) here invoked.

It is impossible to justify the determination made below that the petition be dismissed for insufficiency. At the very least, there should be a trial to afford petitioners an opportunity to establish by proof, if they can, such allegations as those that assert the " close cooperation " between public school authorities and those conducting the classes in religious instruction; the use of public school machinery and the time of public school personnel " necessarily entailed " by the program; the " exercise of pressure and coercion " upon parents and children to secure attendance of children at such classes; the divisive nature

of the program; and the "unlawful censorship of religion and preference in favor of certain religious sects" "effected" by the program. However, I believe — as did two of the justices in the Appellate Division — that, on the basis of statute, regulations and the admitted allegations of the petition, petitioners are entitled to a decision, on the pleadings, that the released time program under consideration falls within the ban of the Federal Constitution.

Time has taught, and the Supreme Court, by its *McCollum* decision has reaffirmed, the wisdom and necessity of maintaining " a wall * * * high and impregnable " between Church and State, between public school secular education and religious observance and teaching. Maintenance of that barrier was regarded by the Supreme Court, as earlier it had been by the Founding Fathers, not as a demonstration of hostility to religion, but rather as a means of assuring complete freedom of religious worship. In my opinion, the conclusion is inescapable that the released time program in New York City breaches that barrier.

Accordingly, I would reverse and direct entry of a final order granting the relief sought in the petition.

LEWIS, CONWAY and DYE, JJ., concur with FROESSEL, J.; LOUGHRAN, Ch. J., concurs for affirmance upon the authority of *People ex rel. Lewis* v. *Graves* (245 N. Y. 195); DESMOND, J., concurs for affirmance in a separate opinion; FULD, J., dissents in opinion.

Order affirmed.