ALBANY,
August, 1811.

THE PEOPLE
v.
RUGGLES.

fendants. (*S. Southwick.*)   The other two defendants pleaded.

A motion was now made by *Lansing,* one of the other defendants, for judgment as in case of nonsuit, for not bringing the cause to trial.

It appeared that in *August* term last, the *venue* had been changed from *New-York* to *Albany;* but that the declaration filed in the cause was not altered or amended accordingly, nor was any new declaration required or served.

—————⊕—————

THE PEOPLE *against* RUGGLES.

*Blasphemy a-*
*gainst* GOD, *and*
*contumelious re-*
*proaches, and*
*profane ridicule*
*of* CHRIST *or the holy scriptures, are offences punishable at the common law, whether uttered by words or writings.*

*Wantonly, wickedly, and maliciously uttering the following words, " Jesus Christ was a bastard, and his mother must be a whore," was held to be a public offence, and punishable by the common law of this state.*

THE defendant was indicted at the general sessions of the peace, held at *Kingsbury,* in the county of *Washington,* in *December,* 1810, for that he did, on the 2d

day of *September*, 1810, at *Salem*, &c. *wickedly*, *maliciously*, and *blasphemously*, utter, and with a loud voice publish, in the presence and hearing of divers good and christian people, &c. of and concerning the christian religion, and of and concerning JESUS CHRIST, the false, scandalous, malicious, wicked and blasphemous words following, to wit, " *Jesus Christ* was a bastard, and his mother must be a whore," in contempt of the christian religion, and the laws of this state, to the evil and pernicious example of all others, &c. The indictment was removed into the court of oyer and terminer and gaol delivery, held on the 11th *June*, 1811, in *Washington* county, before Mr. Justice *Spencer*, and the judges of the common pleas, when the defendant was tried and found guilty, and was sentenced by the court to be imprisoned for three months, and to pay a fine of 500 dollars.

The record of the proceedings and conviction, &c. having been removed to this court,

*Wendell*, for the prisoner, now contended, that the offence charged in the indictment was not punishable by the law of this state, though, he admitted, it was punishable by the common law of *England*, where *christianity* makes part of the law of the land, on account of its connection with the established church. In *England*, apostacy, heresy, reviling the ordinances of the established church, and nonconformity, are made punishable by statute. But from the preamble, and the provisions of the constitution of this state, and the silence of the legislature, it was to be inferred that *christianity* did not make a part of the common law of this state. There are no statutes concerning religion, except those relative to the sabbath, and to suppress immorality. The constitution allows a free toleration to all religions and all kinds of worship. The exception as to *licentiousness*, refers to conduct, not opinions. *Judaism* and *Mahometanism* may be preached here, without any legal animadversion.

For aught that appears, the prisoner may have been a *Jew*, a *Mahometan*, or a *Socinian;* and if so, he had a right, by the constitution, to declare his opinions.

The offence charged in the indictment, attacks only the divinity of Christ. It is not an offence against religion in general; nor does it affect moral evidence, or destroy confidence in human testimony.

*Gold*, contra, observed, that the common law of *England*, as it stood in 1776, was adopted by the constitution, and made part of the law of the state. That *blasphemy*, or the contumelious reproaches of our saviour, were punishable by the common law of *England*, was not on account of there being an established church, but it was a principle coeval with the *English* law, and had stood unshaken amidst all the revolutions and changes in church and state.

*4 Bl. Com. 59.*

*Blasphemy* is defined, by *Blackstone*,* to be the denying the being or providence of GOD; contumelious reproaches of CHRIST; profane scoffing at the holy scripture, or exposing it to contempt and ridicule. In the

† *Str. 834.* See
*W. Black. Rep.*
*398. 1 Vent. 293.*
*3 Keb. 607. 621.*

case of *The King* v. *Woolston*,† the court of *K. B.* declared, that they would not suffer it to be debated, whether to write against christianity in general, was not an offence punishable in the temporal courts, at common law. While the constitution of the state has saved the rights of conscience, and allowed a free and fair discussion of all points of controversy among religious sects, it has left the principle engrafted on the body of our common law, that christianity is part of the laws of the state, untouched and unimpaired.

KENT, Ch. J. delivered the opinion of the court. The offence charged is, that the defendant below did " wickedly, maliciously, and blasphemously utter, in the presence and hearing of divers good and christian people, these false, feigned, scandalous, malicious, wicked and blasphemous words, to wit, " *Jesus Christ* was a bastard,

and his mother must be a whore;" and the single question is, whether this be a public offence by the law of the land. After conviction, we must intend that these words were uttered in a wanton manner, and, as they evidently import, with a wicked and malicious disposition, and not in a serious discussion upon any controverted point in religion. The language was blasphemous not only in a popular, but in a legal sense; for blasphemy, according to the most precise definitions, consists in maliciously reviling God, or religion, and this was reviling christianity through its author. (*Emlyn's Preface to the State Trials*, p. 8. See also *Whitlock's Speech, State Trials*, vol. 2. 273.) The jury have passed upon the intent or *quo animo*, and if those words spoken, in any case, will amount to a misdemeanor, the indictment is good.

Such words, uttered with such a disposition, were an offence at common law. In *Taylor's* case, (1 *Vent.* 293. 3 *Keb.* 607. *Tremaine's Pleas of the Crown*, 226. S. C.) the defendant was convicted upon information of speaking similar words, and the court of *K. B.* said, that christianity was parcel of the law, and to cast contumelious reproaches upon it, tended to weaken the foundation of moral obligation, and the efficacy of oaths. And in the case of *Rex* v. *Woolston*, (*Str.* 834. *Fitzg.* 64.) on a like conviction, the court said they would not suffer it to be debated whether defaming christianity in general was not an offence at common law, for that whatever strikes at the root of christianity, tends manifestly to the dissolution of civil government. But the court were careful to say, that they did not intend to include disputes between learned men upon particular controverted points. The same doctrine was laid down in the late case of *The King* v. *Williams*, for the publication of *Paine's* " *Age of Reason*," which was tried before Lord *Kenyon*, in *July*, 1797. The authorities show that blasphemy against God, and contumelious reproaches and profane ridicule of Christ or the holy scriptures, (which are equally treat-

ed as blasphemy,) are offences punishable at common law, whether uttered by words or writings. (*Taylor's* case, 1 *Vent.* 293. 4 *Blacks. Com.* 59. 1 *Hawk.* b. 1. c. 5. 1 *East's P. C.* 3. · *Tremaine's Entries*, 225. *Rex* v. *Doyley.*) The consequences may be less extensively pernicious in ithe one case than in the other, but in both instances, the reviling is still an offence, because it tends to corrupt the morals of the people, and to destroy good order. Such offences have always been considered independent of any religious establishment or the rights of the church. They are treated as affecting the essential interests of civil society.

And why should not the language contained in the indictment be still an offence with us? There is nothing in our manners or institutions which has prevented the application or the necessity of this part of the common law. We stand equally in need, now as formerly, of all that moral discipline, and of those principles of virtue, which help to bind society together. The people of this state, in common with the people of this country, profess the general doctrines of christianity, as the rule of their faith and practice; and to scandalize the author of these doctrines is not only, in a religious point of view, extremely impious, but, even in respect to the obligations due to society, is a gross violation of decency and good order. Nothing could be more offensive to the virtuous part of the community, or more injurious to the tender morals of the young, than to declare such profanity lawful. It would go to confound all distinction between things sacred and profane; for to use the words of one of the greatest oracles of human wisdom, " profane scoffing doth by little and little deface the reverence for religion;" and who adds, in another place, " two principal causes have I ever known of atheism—curious controversies and profane scoffing." (Lord *Bacon's Works*, vol. 2. 291. 503.) Things which corrupt moral sentiment, as obscene actions, prints and · writings, and even gross in-

stances of seduction, have, upon the same principle, been held indictable; and shall we form an exception in these particulars to the rest of the civilized world? No government among any of the polished nations of antiquity, and none of the institutions of modern *Europe*, (a single and monitory case excepted,) ever hazarded such a bold experiment upon the solidity of the public morals, as to permit with impunity, and under the sanction of their tribunals, the general religion of the community to be openly insulted and defamed. The very idea of jurisprudence with the ancient lawgivers and philosophers, embraced the religion of the country. *Jurisprudentia est divinarum atque humanarum rerum notitia.* (*Dig.* b. 1. 10. 2. *Cic. De Legibus,* b. 2. *passim.*)

The free, equal, and undisturbed enjoyment of religious opinion, whatever it may be, and free and decent discussions on any religious subject, is granted and secured; but to revile, with malicious and blasphemous contempt, the religion professed by almost the whole community, is an abuse of that right. Nor are we bound, by any expressions in the constitution, as some have strangely supposed, either not to punish at all, or to punish indiscriminately the like attacks upon the religion of *Mahomet* or of the grand *Lama*; and for this plain reason, that the case assumes that we are a christian people, and the morality of the country is deeply ingrafted upon christianity, and not upon the doctrines or worship of those impostors. Besides, the offence is *crimen malitiæ*, and the imputation of malice could not be inferred from any invectives upon superstitions equally false and unknown. We are not to be restrained from animadversion upon offences against public decency, like those committed by Sir *Charles Sedley*, (1 *Sid.* 168.) or by one *Rollo*, (*Sayer*, 158.) merely because there may be savage tribes, and perhaps semi-barbarous nations, whose sense of shame would not be affected by what we should consider

ALBANY,
August, 1811.

THE PEOPLE
v.
RUGGLES.

the most audacious outrages upon decorum. It is sufficient that the common law checks upon words and actions, dangerous to the public welfare, apply to our case, and are suited to the condition of this and every other people whose manners are refined, and whose morals have been elevated and inspired with a more enlarged benevolence, by means of the christian religion.

Though the constitution has discarded religious establishments, it does not forbid judicial cognisance of those offences against religion and morality which have no reference to any such establishment, or to any particular form of government, but are punishable because they strike at the root of moral obligation, and weaken the security of the social ties. The object of the 38th article of the constitution, was, to "guard against spiritual oppression and intolerance" by declaring that "the free exercise and enjoyment of religious profession and worship, without discrimination or preference, should for ever thereafter be allowed within this state, to all mankind." This declaration (noble and magnanimous as it is, when duly understood) never meant to withdraw religion in general, and with it the best sanctions of moral and social obligation, from all consideration and notice of the law. It will be fully satisfied by a free and universal toleration, without any of the tests, disabilities, or discriminations, incident to a religious establishment. To construe it as breaking down the common law barriers against licentious, wanton, and impious attacks upon christianity itself, would be an enormous perversion of its meaning. The *proviso* guards the article from such dangerous latitude of construction, when it declares, that "*the liberty of conscience hereby granted*, shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of this state." The preamble and this *proviso* are a species of commentary upon the meaning of the article, and they sufficiently show that the framers of the constitution intended only

to banish test oaths, disabilities and the burdens, and sometimes the oppressions, of church establishments; and to secure to the people of this state, freedom from coercion, and an equality of right, on the subject of religion. This was no doubt the consummation of their wishes. It was all that reasonable minds could require, and it had long been a favourite object, on both sides of the *Atlantic,* with some of the most enlightened friends to the rights of mankind, whose indignation had been roused by infringements of the liberty of conscience, and whose zeal was inflamed in the pursuit of its enjoyment. That this was the meaning of the constitution is further confirmed by a paragraph in a preceding article, which specially provides that " such parts of the common law as might be construed to establish or maintain any particular denomination of christians, or their ministers," were thereby abrogated.

The legislative exposition of the constitution is conformable to this view of it. Christianity, in its enlarged sense, as a religion revealed and taught in the Bible, is not unknown to our law. The *statute for preventing immorality* (*Laws*, vol. 1. 224.) consecrates the first day of the week, as holy time, and considers the violation of it as immoral. This was only the continuation, in substance, of a law of the colony which declared, that the profanation of the Lord's day was " the great scandal of the christian faith." The act *concerning oaths* (*Laws,* vol. 1. p. 405.) recognises the common law mode of administering an oath, " by laying the hand on and kissing the gospels." Surely, then, we are bound to conclude, that wicked and malicious words, writings and actions which go to vilify those gospels, continue, as at common law, to be an offence against the public peace and safety. They are inconsistent with the reverence due to the administration of an oath, and among their other evil con-

sequences, they tend to lessen, in the public mind, its religious sanction.

The court are accordingly of opinion that the judgment below must be affirmed.

Judgment affirmed.