*707 Justice Stevens,
with whom Justice Ginsburg joins,
dissenting.
The sole function of the monument on the grounds of Texas’ State Capitol is to display the full text of one version of the Ten Commandments. The monument is not a work of art and does not refer to any event in the history of the State. It is significant because, and only because, it communicates the following message:
“I AM the LORD thy God.
Thou shalt have no other gods before me.
Thou shalt not make to thyself any graven images.
Thou shalt not take the Name of the Lord thy God in vain. Remember the Sabbath day, to keep it holy.
Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.
Thou shalt not kill.
Thou shalt not commit adultery.
Thou shalt not steal.
Thou shalt not bear false witness against thy neighbor.
Thou shalt not covet thy neighbor’s house.
Thou shalt not covet thy neighbor’s wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor’s.” See Appendix, infra.[1]
Viewed on its face, Texas’ display has no purported connection to God’s role in the formation of Texas or the founding of our Nation; nor does it provide the reasonable observer with any basis to guess that it was erected to honor any individual or organization. The message transmitted by Texas’ chosen display is quite plain: This State endorses the divine code of the “Judeo-Christian” God.
*708 For those of us who learned to recite the King James version of the text long before we understood the meaning of some of its words, God’s Commandments may seem like wise counsel. The question before this Court, however, is whether it is counsel that the State of Texas may proclaim without violating the Establishment Clause of the Constitution. If any fragment of Jefferson’s metaphorical “wall of separation between church and State”[2] is to be preserved— if there remains any meaning to the “wholesome ‘neutrality’ of which this Court’s [Establishment Clause] cases speak,” School Dist. of Abington Township v. Schempp, 374 U. S. 203, 222 (1963) — a negative answer to that question is mandatory.
I
In my judgment, at the very least, the Establishment Clause has created a strong presumption against the display of religious symbols on public property. See, e. g., County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U. S. 573, 650 (1989) (STEVENS, J., concurring in part and dissenting in part); Capitol Square Review and Advisory Bd. v. Pinette, 515 U. S. 753, 797 (1995) (Stevens, J., dissenting). The adornment of our public spaces with displays of religious symbols and messages undoubtedly provides comfort, even inspiration, to many individuals who subscribe to particular faiths. Unfortunately, the practice also runs the risk of “offend[ing] nonmembers of the faith being advertised as well as adherents who consider the particular advertisement disrespectful.” Allegheny County, 492 U. S., at 651 (Stevens, J., concurring in part and dissenting in part).[3]
*709 Government’s obligation to avoid divisiveness and exclusion in the religious sphere is compelled by the Establishment and Free Exercise Clauses, which together erect a wall of separation between church and state.[4] This metaphorical wall protects principles long recognized and often recited in this Court’s cases. The first and most fundamental of these principles, one that a majority of this Court today affirms, is that the Establishment Clause demands religious neutrality — government may not exercise a preference for one religious faith over another. See, e.g., McCreary County v. American Civil Liberties Union of Ky., post, at 874-876.[5] This essential command, however, is not merely a prohibition *710 against the government’s differentiation among religious sects. We have repeatedly reaffirmed that neither a State nor the Federal Government “can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs.” Torcaso v. Watkins, 367 U. S. 488, 495 (1961) (footnote omitted).[6] This principle is based on the straightforward notion that governmental promotion of orthodoxy is not saved by the aggregation of several orthodoxies under the State’s banner. See Abington, 374 U. S., at 222.
Acknowledgments of this broad understanding of the neutrality principle are legion in our cases.[7] Strong arguments to the contrary have been raised from time to time, perhaps the strongest in then-JuSTiCE Rehnquist’s scholarly dis *711 sent in Wallace v. Jaffree, 472 U. S. 38, 91-114 (1985).[8] Powerful as his argument was, we squarely rejected it and thereby reaffirmed the principle that the Establishment Clause requires the same respect for the atheist as it does for the adherent of a Christian faith. As we wrote, “the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all.” Id., at 52-53.
In restating this principle, I do not discount the importance of avoiding an overly strict interpretation of the metaphor so often used to define the reach of the Establishment Clause. The plurality is correct to note that “religion and religious traditions” have played a “strong role ... throughout our Nation’s history.” Ante, at 683. This Court has often recognized “an unbroken history of official acknowledgment ... of the role of religion in American life.” Lynch v. Donnelly, 465 U. S. 668, 674 (1984); accord, Edwards v. Aguillard, 482 U. S. 578, 606-608 (1987) (Powell, J., concurring). Given this history, it is unsurprising that a religious symbol may at times become an important feature of a familiar landscape or a reminder of an important event in the history of a community. The wall that separates the church from the State does not prohibit the government from acknowledging the religious beliefs and practices of the American people, nor does it require governments to hide works of art or historic memorabilia from public view just because they also have religious significance.
This case, however, is not about historic preservation or the mere recognition of religion. The issue is obfuscated rather than clarified by simplistic commentary on the various *712 ways in which religion has played a role in American life, see ante, at 683-688 (plurality opinion), and by the recitation of the many extant governmental “acknowledgments” of the role the Ten Commandments played in our Nation's heritage,[9] ante, at 687-689, and n. 9. Surely, the mere compilation of religious symbols, none of which includes the full text of the Commandments and all of which are exhibited in different settings, has only marginal relevance to the question presented in this case.
The monolith displayed on Texas Capitol grounds cannot be discounted as a passive acknowledgment of religion, nor can the State’s refusal to remove it upon objection be explained as a simple desire to preserve a historic relic. This Nation’s resolute commitment to neutrality with respect to religion is flatly inconsistent with the plurality’s wholehearted validation of an official state endorsement of the message that there is one, and only one, God.
r — H I — I
When the Ten Commandments monument was donated to the State of Texas in 1961, it was not for the purpose of commemorating a noteworthy event in Texas history, signi *713 fying the Commandments’ influence on the development of secular law, or even denoting the religious beliefs of Texans at that time. To the contrary, the donation was only one of over a hundred largely identical monoliths, and of over a thousand paper replicas, distributed to state and local governments throughout the Nation over the course of several decades. This ambitious project was the work of the Fraternal Order of Eagles, a well-respected benevolent organization whose good works have earned the praise of several Presidents.[10]
As the story goes, the program was initiated by the late Judge E. J. Ruegemer, a Minnesota juvenile court judge and then-Chairman of the Eagles National Commission on Youth Guidance. Inspired by a juvenile offender who had never heard of the Ten Commandments, the judge approached the Minnesota Eagles with the idea of distributing paper copies of the Commandments to be posted in courthouses nationwide. The State’s Aerie undertook this project and its popularity spread. When Cecil B. DeMille, who at that time was filming the movie The Ten Commandments, heard of the judge’s endeavor, he teamed up with the Eagles to produce the type of granite monolith now displayed in front of the Texas Capitol and at courthouse squares, city halls, and public parks throughout the Nation. Granite was reportedly chosen over DeMille’s original suggestion of bronze plaques to better replicate the original Ten Commandments.[11]
*714 The donors were motivated by a desire to “inspire the youth” and curb juvenile delinquency by providing children with a “‘code of conduct or standards by which to govern their actions.' ”[12] It is the Eagles’ belief that disseminating the message conveyed by the Ten Commandments will help to persuade young men and women to observe civilized standards of behavior, and will lead to more productive lives. Significantly, although the Eagles’ organization is nonsectarian, eligibility for membership is premised on a belief in the existence of a “Supreme Being.”[13] As described by the Eagles themselves:
“ ‘[I]n searching for a youth guidance program [we] recognized that there can be no better, no more defined program of Youth Guidance, and adult guidance as well, than the laws handed down by God Himself to Moses more than 3000 years ago, which laws have stood unchanged through the years. They are a fundamental part of our lives, the basis of all our laws for living, the foundation of our relationship with our Creator, with our families and with our fellow men. All the concepts we *715 live by — freedom, democracy, justice, honor — are rooted in the Ten Commandments.
“ 'The erection of these monoliths is to inspire all who pause to view them, with a renewed respect for the law of God, which is our greatest strength against the forces that threaten our way of life.’ ” Anderson v. Salt Lake City Corp., 348 F. Supp. 1170, 1172 (Utah 1972), rev’d, 475 F. 2d 29 (CA10 1973).
The desire to combat juvenile delinquency by providing guidance to youths is both admirable and unquestionably secular. But achieving that goal through biblical teachings injects a religious purpose into an otherwise secular endeavor. By spreading the word of God and converting heathens to Christianity, missionaries expect to enlighten their converts, enhance their satisfaction with life, and improve their behavior. Similarly, by disseminating the “law of God” — directing fidelity to God and proscribing murder, theft, and adultery— the Eagles hope that this divine guidance will help wayward youths conform their behavior and improve their lives. In my judgment, the significant secular byproducts that are intended consequences of religious instruction — indeed, of the establishment of most religions — are not the type of “secular” purposes that justify government promulgation of sacred religious messages.
Though the State of Texas may genuinely wish to combat juvenile delinquency, and may rightly want to honor the Eagles for their efforts, it cannot effectuate these admirable purposes through an explicitly religious medium. See Bowen v. Kendrick, 487 U. S. 589, 639-640 (1988) (Blackmun, J., dissenting) (“It should be undeniable by now that religious dogma may not be employed by government even to accomplish laudable secular purposes”). The State may admonish its citizens not to lie, cheat, or steal, to honor their parents, and to respect their neighbors’ property; and it may do so by printed words, in television commercials, or on granite *716 monuments in front of its public buildings. Moreover, the State may provide its schoolchildren and adult citizens with educational materials that explain the important role that our forebears’ faith in God played in their decisions to select America as a refuge from religious persecution, to declare their independence from the British Crown, and to conceive a new Nation. See Edwards, 482 U. S., at 606-608 (Powell, J., concurring). The message at issue in this case, however, is fundamentally different from either a bland admonition to observe generally accepted rules of behavior or a general history lesson.
The reason this message stands apart is that the Beca-logue is a venerable religious text.[14] As we held 25 years ago, it is beyond dispute that “[t]he Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths.” Stone v. Graham, 449 U. S. 39, 41 (1980) (per curiam). For many followers, the Commandments represent the literal word of God as spoken to Moses and repeated to his followers after descending from Mount Sinai. The message conveyed by the Ten Commandments thus cannot be analogized to an appendage to a common article of commerce (“In God we Trust”) or an incidental part of a familiar recital (“God save the United States and this honorable Court”). Thankfully, the plurality does not attempt to minimize the religious significance of the Ten Commandments. Ante, at 690 (“Of course, the Ten Commandments are religious — they were so viewed at their inception and so remain”); ante, at 692 (Thomas, J., concurring); see also McCreary County v. *717 American Civil Liberties Union of Ky., post, at 909 (Scalia, J., dissenting). Attempts to secularize what is unquestionably a sacred text defy credibility and disserve people of faith.
The profoundly sacred message embodied by the text inscribed on the Texas monument is emphasized by the especially large letters that identify its author: “I AM the LORD thy God.” See Appendix, infra. It commands present worship of Him and no other deity. It directs us to be guided by His teaching in the current and future conduct of all of our affairs. It instructs us to follow a code of divine law, some of which has informed and been integrated into our secular legal code (“Thou shalt not kill”), but much of which has not (“Thou shalt not make to thyself any graven images.... Thou shalt not covet”).
Moreover, despite the Eagles’ best efforts to choose a benign nondenominational text,[15] the Ten Commandments display projects not just a religious, but an inherently sectarian, message. There are many distinctive versions of the Decalogue, ascribed to by different religions and even different denominations within a particular faith; to a pious and learned observer, these differences may be of enormous reli *718 gious significance.[16] See Lubet, The Ten Commandments in Alabama, 15 Constitutional Commentary 471, 474-476 (Fall 1998). In choosing to display this version of the Commandments, Texas tells the observer that the State supports this side of the doctrinal religious debate. The reasonable observer, after all, has no way of knowing that this text was the product of a compromise, or that there is a rationale of any kind for the text’s selection.[17]
The Establishment Clause, if nothing else, prohibits government from “specifying details upon which men and women who believe in a benevolent, omnipotent Creator and Ruler of the world are known to differ.” Lee v. Weisman, 505 U. S. 577, 641 (1992) (Scalia, J., dissenting). Given that the chosen text inscribed on the Ten Commandments monument invariably places the State at the center of a serious *719 sectarian dispute, the display is unquestionably unconstitutional under our case law. See Larson v. Valente, 456 U. S. 228, 244 (1982) (“The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another”).
Even if, however, the message of the monument, despite the inscribed text, fairly could be said to represent the belief system of all Judeo-Christians, it would still run afoul of the Establishment Clause by prescribing a compelled code of conduct from one God, namely, a Judeo-Christian God, that is rejected by prominent polytheistic sects, such as Hinduism, as well as nontheistic religions, such as Buddhism.[18] See, e. g., Allegheny County, 492 U. S., at 615 (opinion of Blaekmun, J.) (“The simultaneous endorsement of Judaism and Christianity is no less constitutionally infirm than the endorsement of Christianity alone”). And, at the very least, the text of the Ten Commandments impermissibly commands a preference for religion over irreligión. See, e. g., id., at 590 (The Establishment Clause “guarantee^] religious liberty and equality to ‘the infidel, the atheist, or the adherent *720 of a non-Christian faith such as Islam or Judaism' ” (quoting Wallace, 472 U. S., at 52)). Any of those bases, in my judgment, would be sufficient to conclude that the message should not be proclaimed by the State of Texas on a permanent monument at the seat of its government.
I do not doubt that some Texans, including those elected to the Texas Legislature, may believe that the statues displayed on the Texas Capitol grounds, including the Ten Commandments monument, reflect the “ideals . . . that compose Texan identity.” Tex. H. Con. Res. 38, 77th Leg., Reg. Sess. (2001). But Texas, like our entire country, is now a much more diversified community than it was when it became a part of the United States or even when the monument was erected. Today there are many Texans who do not belieye in the God whose Commandments are displayed at their seat of government. Many of them worship a different god or no god at all. Some may believe that the account of the creation in the Book of Genesis is less reliable than the views of men like Darwin and Einstein. The monument is no more an expression of the views of every true Texan than was the “Live Free or Die” motto that the State of New Hampshire placed on its license plates in 1969 an accurate expression of the views of every citizen of New Hampshire. See Wooley v. Maynard, 430 U. S. 705 (1977).
Recognizing the diversity of religious and secular beliefs held by Texans and by all Americans, it seems beyond peradventure that allowing the seat of government to serve as a stage for the propagation of an unmistakably Judeo-Christian message of piety would have the tendency to make nonmonotheists and nonbelievers “feel like [outsiders] in matters of faith, and [strangers] in the political community.” Pinette, 515 U. S., at 799 (Stevens, J., dissenting). “[Displays of this kind inevitably have a greater tendency to emphasize sincere and deeply felt differences among individuals than to achieve an ecumenical goal.” Allegheny County, 492 *721 U. S., at 651 (Stevens, J., concurring in part and dissenting in part).[19]
Even more than the display of a religious symbol on government property, see Pinette, 515 U. S., at 797 (Stevens, J., dissenting); Allegheny County, 492 U. S., at 650-651 (Stevens, J., concurring in part and dissenting in part), displaying this sectarian text at the state capítol should invoke a powerful presumption of invalidity. As Justice Souter’s opinion persuasively demonstrates, the physical setting in which the Texas monument is displayed — far from rebutting that presumption — actually enhances the religious content of its message. See post, at 742-743 (dissenting opinion). The monument’s permanent fixture at the seat of Texas government is of immense significance. The fact that a monument
"is installed on public property implies official recognition and reinforcement of its message. That implication is especially strong when the sign stands in front of the seat of the government itself. The ‘reasonable observer’ of any symbol placed unattended in front of any capítol in the world will normally assume that the sovereign — which is not only the owner of that parcel of real estate but also the lawgiver for the surrounding territory — has sponsored and facilitated its message.” Pinette, 515 U. S., at 801-802 (Stevens, J., dissenting).
Critical examination of the Decalogue’s prominent display at the seat of Texas government, rather than generic citation *722 to the role of religion in American life, unmistakably reveals on which side of the “slippery slope,” ante, at 704 (Breyer, J., concurring in judgment), this display must fall. God, as the author of its message, the Eagles, as the donor of the monument, and the State of Texas, as its proud owner, speak with one voice for a common purpose — to encourage Texans to abide by the divine code of a “Judeo-Christian” God. If this message is permissible, then the shining principle of neutrality to which we have long adhered is nothing more than mere shadow.
Ill
The plurality relies heavily on the fact that our Republic was founded, and has been governed since its nascence, by leaders who spoke then (and speak still) in plainly religious rhetoric. The Chief Justice cites, for instance, George Washington’s 1789 Thanksgiving Proclamation in support of the proposition that the Establishment Clause does not proscribe official recognition of God’s role in our Nation’s heritage, ante, at 687.[20] Further, the plurality emphatically endorses the seemingly timeless recognition that our “institutions presuppose a Supreme Being,” ante, at 683. Many of the submissions made to this Court by the parties and amici, in accord with the plurality’s opinion, have relied on the ubiquity of references to God throughout our history.
The speeches and rhetoric characteristic of the founding era, however, do not answer the question before us. I have already explained why Texas’ display of the full text of the Ten Commandments, given the content of the actual display *723 and the context in which it is situated, sets this case apart from the countless examples of benign government recognitions of religion. But there is another crucial difference. Our leaders, when delivering public addresses, often express their blessings simultaneously in the service of God and their constituents. Thus, when public officials deliver public speeches, we recognize that their words are not exclusively a transmission from the government because those oratories have embedded within them the inherently personal views of the speaker as an individual member of the polity.[21] The permanent placement of a textual religious display on state property is different in kind; it amalgamates otherwise discordant individual views into a collective statement of government approval. Moreover, the message never ceases to transmit itself to objecting viewers whose only choices are to accept the message or to ignore the offense by averting their gaze. Cf. Allegheny County, 492 U. S., at 664 (Kennedy, J., concurring in judgment in part and dissenting in part); ante, at 695 (Thomas, J., concurring). In this sense, although Thanksgiving Day proclamations and inaugural speeches undoubtedly seem official, in most circumstances they will not constitute the sort of governmental endorsement of religion at which the separation of church and state is aimed.[22]
*724 The plurality’s reliance on early religious statements and proclamations made by the Founders is also problematic because those views were not espoused at the Constitutional Convention in 1787[23] nor enshrined in the Constitution’s text. Thus, the presentation of these religious statements as a unified historical narrative is bound to paint a misleading picture. It does so here. In according deference to the statements of George Washington and John Adams, The Chief Justice and Justice Scalia, see ante, at 687 (plurality opinion); McCreary County, post, at 886,887-888 (dissenting opinion), fail to account for the acts and publicly espoused views of other influential leaders of that time. Notably absent from their historical snapshot is the fact that Thomas Jefferson refused to issue the Thanksgiving proclamations that Washington had so readily embraced based on the argument that to do so would violate the Establishment Clause.[24] The Chief Justice and Justice Scalia disregard the substantial debates that took place regarding the constitutionality of the early proclamations and acts they cite, see, e. g., Letter from James Madison to Edward Livingston (July 10, 1822), in 5 Founders’ Constitution 105-106 (arguing that Congress’ appointment of Chaplains to be paid from the National Treasury was “not with my approbation” and was a “deviation” from the principle of “immunity of Religion from civil *725 jurisdiction”),[25] and paper over the fact that Madison more than once repudiated the views attributed to him by many, stating unequivocally that with respect to government’s involvement with religion, the “ ‘tendency to a usurpation on one side, or the other, or to a corrupting coalition or alliance between them, will be best guarded against by an entire abstinence of the Government from interference, in any way whatever, beyond the necessity of preserving public order, & protecting each sect against trespasses on its legal rights by others.’”[26]
These seemingly nonconforming sentiments should come as no surprise. Not insignificant numbers of colonists came to this country with memories of religious persecution by *726 . monarchs on the other side of the Atlantic. See A. Stokes & L. Pfeffer, Church and State in the United States 3-23 (rev. 1st. ed. 1964). Others experienced religious intolerance at the hands of colonial Puritans, who regrettably failed to practice the tolerance that some of their contemporaries preached. Engel v. Vitale, 370 U. S. 421, 427-429 (1962). The Chief Justice and Justice Scalia ignore the separationist impulses — in accord with the principle of “neutrality” — that these individuals brought to the debates surrounding the adoption of the Establishment Clause.[27]
Ardent separationists aside, there is another critical nuance lost in the plurality’s portrayal of history. Simply put, many of the Founders who are often cited as authoritative expositors of the Constitution’s original meaning understood the Establishment Clause to stand for a narrower proposition than the plurality, for whatever reason, is willing to accept. Namely, many of the Framers understood the word “religion” in the Establishment Clause to encompass only the various sects of Christianity.
The evidence is compelling. Prior to the Philadelphia Convention, the States had begun to protect “religious freedom” in their various constitutions. Many of those provisions, however, restricted “equal protection” and “free ex *727 ercise” to Christians, and invocations of the divine were commonly understood to refer to Christ.[28] That historical background likely informed the Framers’ understanding of the First Amendment. Accordingly, one influential thinker wrote of the First Amendment that “ ‘[t]he meaning of the term “establishment” in this amendment unquestionably is, the preference and establishment given by law to one sect of Christians over every other.’ ” Jasper Adams, The Relation of Christianity to Civil Government in the United States (Feb. 13, 1833) (quoted in Dreisbach 16). That definition tracked the understanding of the text Justice Story adopted in his famous Commentaries, in which he wrote that the “real object” of the Clause was
“not to countenance, much less to advance Mahometanism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects, and to prevent any national ecclesiastical establishment, which should give to an hierarchy the exclusive patronage of the national government. It thus sought to cut off the means of religious persecution, (the vice and pest of former ages,) and the power of subverting the rights of conscience in matters of religion, which had been trampled upon almost from the days of the Apostles to the present age.” J. Story, Commentaries on the Constitution of the United States §991, p. 701 (R. Rotunda & J. Nowak eds. 1987) (hereinafter Story); see also Wallace, 472 U. S., at 62-55, and n. 36.[29]
*728 Along these lines, for nearly a century after the founding, many accepted the idea that America was not just a religious Nation, but “a Christian nation.” Church of Holy Trinity v. United States, 143 U. S. 457, 471 (1892).[30]
The original understanding of the type of “religion” that qualified for constitutional protection under the Establishment Clause likely did not include those followers of Judaism and Islam who are among the preferred “monotheistic” religions Justice Scalia has embraced in his McCreary County opinion. See post, at 893-894 (dissenting opinion).[31] *729 The inclusion of Jews and Muslims inside the category of constitutionally favored religions surely would have shocked Chief Justice Marshall and Justice Story. Indeed, Justice Scalia is unable to point to any persuasive historical evidence or entrenched traditions in support of his decision to give specially preferred constitutional status to all monotheistic religions. Perhaps this is because the history of the Establishment Clause’s original meaning just as strongly supports a preference for Christianity as it does a preference for monotheism. Generic references to "God” hardly constitute evidence that those who spoke the word meant to be inclusive of all monotheistic believers; nor do such references demonstrate that those who heard the word spoken understood it broadly to include all monotheistic faiths. See supra, at 726-727. Justice Scalia’s inclusion of Judaism and Islam is a laudable act of religious tolerance, but it is one that is unmoored from the Constitution’s history and text, and moreover one that is patently arbitrary in its inclusion of some, but exclusion of other (e. g., Buddhism), widely practiced non-Christian religions. See supra, at 719, and n. 18 (noting that followers of Buddhism nearly equal the number of Americans who follow Islam). Given the original understanding of the men who championed our “Christian nation” — men who had no cause to view anti-Semitism or contempt for atheists as problems worthy of civic concern— one must ask whether Justice Scalia “has not had the courage (or the foolhardiness) to apply [his originalism] principle consistently.” McCreary County, post, at 890.
Indeed, to constrict narrowly the reach of the Establishment Clause to the views of the Founders would lead to more than this unpalatable result; it would also leave us with an unincorporated constitutional provision — in other words, one that limits only the federal establishment of “a national religion.” See Elk Grove Unified School Dist. v. Newdow, 542 *730 U. S. 1, 45, 50, 51 (2004) (Thomas, J., concurring in judgment); cf. A. Amar, The Bill of Rights 36-39 (1998). Under this view, not only could a State constitutionally adorn all of its public spaces with crucifixes or passages from the New Testament, it would also have full authority to prescribe the teachings of Martin Luther or Joseph Smith as the official state religion. Only the Federal Government would be prohibited from taking sides (and only then as between Christian sects).
A reading of the First Amendment dependent on either of the purported original meanings expressed above would eviscerate the heart of the Establishment Clause. It would replace Jefferson’s “wall of separation” with a perverse wall of exclusion — Christians inside, non-Christians out. It would permit States to construct walls of their own choosing — Baptists inside, Mormons out; Jewish Orthodox inside, Jewish Reform out. A Clause so understood might be faithful to the expectations of some of our Founders, but it is plainly not worthy of a society whose enviable hallmark over the course of two centuries has been the continuing expansion of religious pluralism and tolerance. Cf. Abington, 374 U. S., at 214; Zelman v. Simmons-Harris, 536 U. S. 639, 720, 723 (2002) (Breyer, J., dissenting).
Unless one is willing to renounce over 65 years of Establishment Clause jurisprudence and cross back over the incorporation bridge, see Cantwell v. Connecticut, 310 U. S. 296, 303 (1940), appeals to the religiosity of the Framers ring hollow.[32] But even if there were a coherent way to embrace *731 incorporation with one hand while steadfastly abiding by the Founders’ purported religious views on the other, the problem of the selective use of history remains. As the widely divergent views espoused by the leaders of our founding era plainly reveal, the historical record of the preincorporation Establishment Clause is too indeterminate to serve as an interpretive North Star.[33]
It is our duty, therefore, to interpret the First Amendment’s command that “Congress shall make no law respecting an establishment of religion” not by merely asking what those words meant to observers at the time of the founding, but instead by deriving from the Clause’s text and history the broad principles that remain valid today. As we have said in the context of statutory interpretation, legislation “often [goes] beyond the principal evil [at which the statute was aimed] to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the princi *732 pal concerns of our legislators by which we are governed.” Oncale v. Sundowner Offshore Services, Inc., 523 U. S. 75, 79 (1998). In similar fashion, we have construed the Equal Protection Clause of the Fourteenth Amendment to prohibit segregated schools, see Brown v. Board of Education, 349 U. S. 294 (1955), even though those who drafted that Amendment evidently thought that separate was not unequal.[34] We have held that the same Amendment prohibits discrimination against individuals on account of their gender, Frontiero v. Richardson, 411 U. S. 677 (1973), despite the fact that the contemporaries of the Amendment “doubt[ed] very much whether any action of a State not directed by way of discrimination against the negroes as a class, or on account of their race, will ever be held to come within the purview of this provision,” Slaughter-House Cases, 16 Wall. 36, 81 (1873). And we have construed “evolving standards of decency” to make impermissible practices that were not considered “cruel and unusual” at the founding. See Roper v. Simmons, 543 U. S. 551, 587 (2005) (Stevens, J., concurring).
To reason from the broad principles contained in the Constitution does not, as Justice Scalia suggests, require us to abandon our heritage in favor of unprincipled expressions of personal preference. The task of applying the broad principles that the Framers wrote into the text of the First Amendment is, in any event, no more a matter of personal preference than is one’s selection between two (or more) sides in a heated historical debate. We serve our constitutional mandate by expounding the meaning of constitutional provisions with one eye toward our Nation’s history and the other fixed on its democratic aspirations. See McCulloch v. *733 Maryland, 4 Wheat. 316, 407, 415 (1819) (“[W]e must never forget, that it is a constitution we are expounding” that is intended to “endure for ages to come, and, consequently, to be adapted to the various crises of human affairs”). Constitutions, after all,
“are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, ‘designed to approach immortality as nearly as human institutions can approach it/ The future is their care and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be. Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value and be converted by precedent into impotent and lifeless formulas.” Weems v. United States, 217 U. S. 349, 373 (1910).
The principle that guides my analysis is neutrality.[35] The basis for that principle is firmly rooted in our Nation’s *734 history and our Constitution’s text. I recognize that the requirement that government must remain neutral between religion and irreligión would have seemed foreign to some of the Framers; so too would a requirement of neutrality between Jews and Christians. But cf. Letter from George Washington to the Hebrew Congregation in Newport, R. I. (Aug. 18, 1790), in 6 Papers of George Washington 284, 285 (D. Twohig ed. 1996). Fortunately, we are not bound by the Framers’ expectations — we are bound by the legal principles they enshrined in our Constitution. Story’s vision that States should not discriminate between Christian sects has as its foundation the principle that government must remain neutral between valid systems of belief. As religious pluralism has expanded, so has our acceptance of what constitutes valid belief systems. The evil of discriminating today against atheists, “polytheists [,] and believers in unconcerned deities,” McCreary County, post, at 893 (Scalia, J., dissenting), is in my view a direct descendent of the evil of discriminating among Christian sects. The Establishment Clause *735 thus forbids it and, in turn, prohibits Texas from displaying the Ten Commandments monument the plurality so casually affirms.
IV
The Eagles may donate as many monuments as they choose to be displayed in front of Protestant churches, benevolent organizations’ meeting places, or on the front lawns of private citizens. The expurgated text of the King James version of the Ten Commandments that they have crafted is unlikely to be accepted by Catholic parishes, Jewish synagogues, or even some Protestant denominations, but the message they seek to convey is surely more compatible with church property than with property that is located on the government side of the metaphorical wall.
The judgment of the Court in this case stands for the proposition that the Constitution permits governmental displays of sacred religious texts. This makes a mockery of the constitutional ideal that government must remain neutral between religion and irreligión. If a State may endorse a particular deity’s command to “have no other gods before me,” it is difficult to conceive of any textual display that would run afoul of the Establishment Clause.
The disconnect between this Court’s approval of Texas’ monument and the constitutional prohibition against preferring religion to irreligión cannot be reduced to the exercise of plotting two adjacent locations on a slippery slope. Cf. ante, at 704 (Breyer, J., concurring in judgment). Rather, it is the difference between the shelter of a fortress and exposure to “the winds that would blow” if the wall were allowed to crumble. See TVA v. Hill, 437 U. S. 153, 195 (1978) (internal quotation marks omitted). That wall, however imperfect, remains worth preserving.
I respectfully dissent.
[Appendix to opinion of Stevens, J., follows this page.]
*0 [[Image here]]

 At the bottom of the message, the observer learns that the display was “[presented to the people and youth of Texas by the Fraternal Order of Eagles of Texas” in 1961. See Appendix, infra.

 Reynolds v. United States, 98 U. S. 145, 164 (1879); see also Everson v. Board of Ed. of Ewing, 330 U. S. 1, 16 (1947).

 As Senator Danforth recently reminded us, “efforts to haul references of God into the public square, into schools and courthouses, are far more apt to divide Americans than to advance faith.” Danforth, Onward, Moderate Christian Soldiers, N. Y. Times, June 17, 2005, p. A27.

 The accuracy and utility of this metaphor have been called into question. See, e. g., Wallace v. Jaffree, 472 U. S. 38, 106 (1985) (Rehnquist, J., dissenting); see generally P. Hamburger, Separation of Church and State (2002). Whatever one may think of the merits of the historical debate surrounding Jefferson and the “wall” metaphor, this Court at a minimum has never questioned the concept of the “separation of church and state” in our First Amendment jurisprudence. The Chief Justice’s opinion affirms that principle. Ante, at 683 (demanding a “separation between church and state”). Indeed, even the Court that famously opined that “[w]e are a religious people whose institutions presuppose a Supreme Being,” Zorach v. Clauson, 343 U. S. 306, 313 (1952), acknowledged that “[t]here cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated,” id., at 312. The question we face is how to give meaning to that concept of separation.

 There is now widespread consensus on this principle. See Everson, 330 U. S., at 15 (“Neither a state nor the Federal Government... can pass laws which aid one religion, aid all religions, or prefer one religion over another”); School Dist. of Abington Township v. Schempp, 374 U. S. 203, 226 (1963) (“In the relationship between man and religion, the State is firmly committed to a position of neutrality"); Larson v. Valente, 456 U. S. 228, 244 (1982) (“The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another”); see also Board of Ed. of Kiryas Joel Village School Dist. v. Grumet, 512 U. S. 687, 748 (1994) (Scalia, J., dissenting) (“I have always believed . .. that the Establishment Clause prohibits the favoring of one religion over others”); but see Church of Holy Trinity v. United States, 143 U. S. 457, 470-471 (1892).

 In support of this proposition, the Torcaso Court quoted James Iredell, who in the course of debating the adoption of the Federal Constitution in North Carolina, stated: “ ‘[I]t is objected that the people of America may, perhaps, choose representatives who have no religion at all, and that pagans and Mahometans may be admitted into offices. But how is it possible to exclude any set of men, without taking away that principle of religious freedom which we ourselves so warmly contend for?’ ” 367 U. S., at 495, n. 10 (quoting 4 J. Elliot, Debates in the Several State Conventions on the Adoption of the Federal Constitution 194 (2d ed. 1891)).

 See Everson, 330 U. S., at 18 (the Establishment Clause “requires the state to be . . . neutral in its relations with groups of religious believers and non-believers”); Abington, 374 U. S., at 216 (rejecting the proposition that the Establishment Clause “forbids only governmental preference of one religion over another”); Wallace, 472 U. S., at 52-55 (the interest in “forestalling intolerance extends beyond intolerance among Christian sects — or even intolerance among ‘religions’ — to encompass intolerance of the disbeliever and the uncertain”); cf. Zorach, 343 U. S., at 325 (Jackson, J., dissenting) (“The day that this country ceases to be free for irreligión it will cease to be free for religion — except for the sect that can win political power”).

 Justtce Scalia’s dissent in the other Ten Commandments case we decide today, see McCreary County v. American Civil Liberties Union of Ky., post, at 885-894, raises similar objections. I address these objections directly in Part III.

 Though this Court has subscribed to the view that the Ten Commandments influenced the development of Western legal thought, it has not officially endorsed the far more specific claim that the Ten Commandments played a significant role in the development of our Nation’s foundational documents (and the subsidiary implication that it has special relevance to Texas). Although it is perhaps an overstatement to characterize this latter proposition as “idiotic,” see Tr. of Oral Arg. 34, as one Member of the plurality has done, at the very least the question is a matter of intense scholarly debate. Compare Brief for Legal Historians and Law Scholars as Amicus Curiae in McCreary County v. American Civil Liberties Union of Ky., O. T. 2004, No. 03-1693, with Brief for American Center for Law and Justice as Amicus Curiae. Whatever the historical accuracy of the proposition, the District Court categorically rejected respondents’ suggestion that the State’s actual purpose in displaying the Decalogue was to signify its influence on secular kw and Texas institutions. App. to Pet. for Cert. 32.

 See Brief for Fraternal Order of Eagles as Amicus Curiae 2-3. The Order was formed in 1898 by six Seattle theater owners, promptly joined by actors, playwrights, and stagehands, and rapidly expanded to include a nationwide membership numbering over a million. Id., at 1-2; see also Fraternal Order of Eagles, Tenino Aerie No. 56k v. Grand Aerie of Fraternal Order of Eagles, 148 Wash. 2d 224, 229, 59 P. 3d 655, 657 (2002) (en banc); Lahmann v. Grand Aerie of Fraternal Order of Eagles, 180 Ore. App. 420, 422, 43 P. 3d 1130, 1131 (2002).

 See Books v. Elkhart, 235 F. 3d 292, 294-295 (CA7 2000); State v. Freedom from Religion Foundation, Inc., 898 P. 2d 1013, 1017 (Colo. 1995) (en banc); see also U. S. Supreme Court will hear Ten Commandments *714 Case in Early 2005, http://www.foe.com/tencoinmandments/index.html (all Internet materials as visited June 24, 2005, and available in Clerk of Court’s case file).

 Brief for Fraternal Order of Eagles as Amicus Curiae 4; Freedom from Religion Foundation, 898 P. 2d, at 1017; accord, Tex. S. Con. Res. 16, 57th Leg., Reg. Sess. (1961) (“These plaques and monoliths have been presented by the Eagles to promote youth morality and to help stop the alarming increase in delinquency”).

 According to its articles of incorporation, the Eagles’ purpose is to: “‘[U]nite fraternally for mutual benefit, protection, improvement, social enjoyment and association, all persons of good moral character who believe in a Supreme Being to inculcate the principles of liberty, truth, justice and equality ....’” Fraternal Order of Eagles, 148 Wash. 2d, at 229, 59 P. 3d, at 657. See also Aerie Membership Application-Fraternal Order of Eagles, http://www.foe.com/membership/applications/aerie.html (“I, being of sound body and mind, and believing in the existence of a Supreme Being ... ”).

 In County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U. S. 578 (1989), I noted that certain displays of religious images may convey “an equivocal message, perhaps of respect for Judaism, for religion in general, or for law.” Id., at 652 (opinion concurring in part and dissenting in part). It is rather misleading, however, to quote my comment in that case to imply that I was referring to the text of the Ten Commandments simpliciter. See McCreary County, post, at 904.

 See ante, at 701 (Breyer, J., concurring in judgment). Despite the Eagles’ efforts, not all of the monuments they donated in fact conform to a “universally-accepted” text. Compare, e. g., Appendix, infra (including the command that “Thou shalt not make to thyself any graven images”), and Adland v. Russ, 307 F. 3d 471, 475 (CA6 2002) (same), with Freedom from Religion Foundation, 898 P. 2d, at 1016 (omitting that command altogether). The distinction represents a critical divide between the Protestant and Catholic faiths. During the Reformation, Protestants destroyed images of the Virgin Mary and of Jesus Christ that were venerated in Catholic churches. Even today there is a notable difference between the imagery in different churches, a difference that may in part be attributable to differing understandings of the meaning of what is the Second Commandment in the King James Bible translation and a portion of the First Commandment in the Catholic translation. See Finkelman, The Ten Commandments on the Courthouse Lawn and Elsewhere, 73 Ford. L. Rev. 1477, 1493-1494 (2005) (hereinafter Finkelman).

 For example, in the Jewish version of the Sixth Commandment God commands: “You shall not murder”; whereas, the King James interpretation of the same command is: “Thou shalt not kill.” Compare W. Plaut, The Torah: A Modern Commentary 534 (1981), with Appendix, infra. The difference between the two versions is not merely semantic; rather, it is but one example of a deep theological dispute. See Finkelman 1481-1500; Maier, Enumerating the Decalogue: Do We Number the Ten Commandments Correctly? 16 Concordia J. 18, 18-26 (1990). Varying interpretations of this Commandment explain the actions of vegetarians who refuse to eat meat, pacifists who refuse to work for munitions makers, prison officials who refuse to administer lethal injections to death row inmates, and pharmacists who refuse to sell morning-after pills to women. See Finkelman 1494-1496; Brief for American Jewish Congress et al. as Amici Curiae 22-23. Although the command is ambiguous, its power to motivate like-minded interpreters of its message cannot be denied.

 Justice Scalia’s willingness to dismiss the distinct textual versions adhered to by different faiths in the name of generic “monotheism” based on mere speculation regarding their significance, McCreary County, -post, at 909, is not only somewhat ironic, see A. Scalia, A Matter of Interpretation 23-25 (1997), but also serves to reinforce the concern that interjecting government into the religious sphere will offend “adherents who consider the particular advertisement disrespectful,” Allegheny County, 492 U. S., at 651 (Stevens, J., concurring in part and dissenting in part).

 See Brief for Hindu American Foundation et al. as Amici Curiae. Though Justice Scaua disagrees that these sentiments are consistent with the Establishment Clause, he does not deny that our cases wholeheartedly adopt this expression of neutrality. Instead, he suggests that this Court simply discard what he terms the “say-so of earlier Courts,” based in part on his own “say-so” that nonmonotheists make up a statistically insignificant portion of this Nation’s religious community. Mc-Creary County, post, at 889. Besides marginalizing the belief systems of more than 7 million Americans by deeming them unworthy of the special protections he offers monotheists under the Establishment Clause, Justice Scaiia’s measure of analysis may be cause for concern even for the self-proclaimed “popular” religions of Islam and Judaism. The number of Buddhists alone is nearly equal to the number of Muslims in this country, and while those of the Islamic and Jewish faiths only account for 2.2% of all believers, Christianity accounts for 95.5%. See U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States: 2004-2005, p. 55 (124th ed. 2004) (Table No. 67).

 The fact that this particular display has stood unchallenged for over 40 years does not suggest otherwise. One need look no further than the deluge of cases flooding lower courts to realize the discord these displays have engendered. See, e. g., Mercier v. Fraternal Order of Eagles, 395 F. 3d 693 (CA7 2005); ACLU Nebraska Foundation v. Plattsmouth, 358 F. 3d 1020 (CA8 2004); Adland v. Russ, 307 F. 3d 471 (CA6 2002); Summum v. Ogden, 297 F. 3d 995 (CA10 2002); Books v. Elkhart, 235 F. 3d 292 (CA7 2000); State v. Freedom From Religion Foundation, Inc., 898 P. 2d 1013 (Colo. 1995); Anderson v. Salt Lake City Corp., 475 F. 2d 29 (CA10 1973).

 This is, of course, a rhetorical approach not unique to the plurality’s opinion today. Appeals to such religious speeches have frequently been used in support of governmental transmission of religious messages. See, e. g., Wallace, 472 U. S., at 98-104 (Rehnquist, J., dissenting); Lee v. Weisman, 505 U. S. 577, 633-686 (1992) (Scalia, J., dissenting); Santa Fe Independent School Dist. v. Doe, 530 U. S. 290, 318 (2000) (Rehnquist, C. J., dissenting); cf. Lynch, v. Donnelly, 465 U. S. 668, 675-676 (1984).

 It goes without saying that the analysis differs when a listener is coerced into listening to a prayer. See, e.g., Santa Fe Independent School Dist., 530 U. S., at 308-312.

 With respect to the “legislative prayers” cited approvingly by The Chief Justice, ante, at 687-688,1 reiterate my view that “the designation of a member of one religious faith to serve as the sole official chaplain of a state legislature for a period of 16 years constitutes the preference of one faith over another in violation of the Establishment Clause.” Marsh v. Chambers, 463 U. S. 783, 823 (1983) (Stevens, J., dissenting). Thus, Justice Scalia and I are in agreement with respect to at least one point — this Court’s decision in Marsh “ignor[ed] the neutrality principle” at the heart of the Establishment Clause. McCreary County, post, at 892 (Scalia, J., dissenting).

 See, e. g., J. Hutson, Religion and the Founding of the American Republic 75 (1998) (noting the dearth of references to God at the Philadelphia Convention and that many contemporaneous observers of the Convention complained that “the Framers had unaccountably turned their backs on the Almighty” because they “'found the Constitution without any acknowledgement of God’ ”).

 See Letter from Thomas Jefferson to Rev. S. Miller (Jan. 23, 1808), in 5 The Founders’ Constitution 98 (P. Kurland & R. Lemer eds. 1987) (hereinafter Founders’ Constitution); 11 Jefferson’s Writings 428-430 (1905); see also Lee, 505 U. S., at 623-625 (Souter, J., concurring) (documenting history); Lynch, 465 U. S., at 716, n. 23 (Brennan, J., dissenting) (same).

 See also James Madison, Detached Memoranda, in 5 Founders’ Constitution 103-104. Madison’s letter to Livingston further argued: “There has been another deviation from the strict principle in the Executive Proclamations of fasts & festivals, so far, at least, as they have spoken the language of injunction, or have lost sight of the equality of all religious sects in the eve of the Constitution. . . . Notwithstanding the general progress made within the two last centuries in favour of this branch of liberty, & the full establishment of it, in some parts of our Country, there remains in others a strong bias towards the old error, that without some sort of alliance or coalition between [Government] & Religion neither can be duly supported. Such indeed is the tendency to such a coalition, and such its corrupting influence on both the parties, that the danger cannot be too carefully guarded [against]. . . . Every new & successful example therefore of a perfect separation between ecclesiastical and civil matters, is of importance. And I have no doubt that every new example, will succeed, as every past one has done, in shewing that religion & [Government] will both exist in greater purity, the less they are mixed together.” Id., at 105-106.

 Religion and Politics in the Early Republic 20-21 (D. Dreisbach ed. 1996) (hereinafter Dreisbach) (quoting Letter from James Madison to Jasper Adams (1833)). See also Letter from James Madison to Edward Livingston (July 10,1822), in 5 Founders’ Constitution 106 (“We are teaching the world the great truth that [governments] do better without Kings & Nobles than with them. The merit will be doubled by the other lesson that Religion flourishes in greater purity, without than with the aid of [government]”).

 The contrary evidence cited by The Chief Justice and Justice Scalia only underscores the obvious fact that leaders who have drafted and voted for a text are eminently capable of violating their own rules. The first Congress was — -just as the present Congress is — capable of passing unconstitutional legislation. Thus, it is no answer to say that the Founders’ separationist impulses were “plainly rejected” simply because the first Congress enacted laws that acknowledged God. See McCreary County, post, at 896 (Scalia, J., dissenting). To adopt such an interpretive approach would misguidedly give authoritative weight to the fact that the Congress that proposed the Fourteenth Amendment also enacted laws that tolerated segregation, and the fact that 10 years after proposing the First Amendment, Congress enacted the Alien and Sedition Act, which indisputably violated our present understanding of the First Amendment. See n. 34, infra; Lee, 505 U. S., at 626 (Soutek, J., concurring).

 See, e. g., Strang, The Meaning of “Religion” in the First Amendment, 40 Duquesne L. Rev. 181, 220-223 (2002).

 Justice Story wrote elsewhere that ‘“Christianity is indispensable to the true interests & solid foundations of all free governments. I distinguish . . . between the establishment of a particular sect, as the Religion of the State, & the Establishment of Christianity itself, without any preference of any particular form of it. I know not, indeed, how any deep sense of moral obligation or accountableness can be expected to prevail in the community without a firm persuasion of the great Christian *728 Truths.’” Letter to Jasper Adams (May 14, 1838) (quoted in Dreisbach 19).

 See 143 U. S., at 471 (“‘[W]e are a Christian people, and the morality of the country is deeply ingrafted upon Christianity, and not upon the doctrines or worship of . . . imposters’” (quoting People v. Ruggles, 8 Johns. 290, 295 (N. Y. 1811))); see also Vidal v. Philadelphia, 2 How. 127, 198-199 (1844). These views should not be read as those of religious zealots. Chief Justice Marshall himself penned the historical genesis of the Court’s assertion that our “institutions presuppose a Supreme Being,” see Zorach, 343 U. S., at 313, writing that the “ ‘American population is entirely Christian, & with us, Christianity & Religion are identified. It would be strange, indeed, if with such a people, our institutions did not presuppose Christianity, & did not often refer to it, & exhibit relations with it,”’ Letter from John Marshall to Jasper Adams (May 9, 1833) (quoted in Dreisbach 18-19). Accord, Story §988, at 700 (“[A]t the time of the adoption of the constitution, . .. the general, if not the universal, sentiment in America was, that Christianity ought to receive encouragement from the state ... ”).

 Justice Scalia’s characterization of this conclusion as nothing more than my own personal “assurance” is misleading to say the least. Mc-Creary County, post, at 898. Reliance on our Nation’s early constitutional scholars is common in this Court’s opinions. In particular, the author of the plurality once noted that “Joseph Story, a Member of this Court from 1811 to 1845, and during much of that time a professor at the Harvard Law School, published by far the most comprehensive treatise on the United States Constitution that had then appeared.” Wallace, 472 U. S., at 104 (Rehnquist, J., dissenting). And numerous opinions of this Court, including two notable opinions authored by Justice Scalia, have seen it fit to give authoritative weight to Joseph Story’s treatise when interpreting other constitutional provisions. See, e. g., United States v. Gaudin, *729 515 U. S. 506, 510-511 (1995) (Fifth Amendment); Harmelin v. Michigan, 501 U. S. 957, 981-982 (1991) (Eighth Amendment).

 Justice Scalia’s answer — that incorporation does not empty “the incorporated provisions of their original meaning,” McCreary County, post, at 898 — ignores the fact that the Establishment Clause has its own unique history. There is no evidence, for example, that incorporation of the Confrontation Clause ran contrary to the core of the Clause’s original understanding. There is, however, some persuasive evidence to this effect regarding the Establishment Clause. See Elk Grove Unified School Dist. v. Newdow, 542 U. S. 1, 49 (2004) (Thomas, J., concurring in judgment) (arguing that the Clause was originally understood to be a “federalism *731 provision” intended to prevent “Congress from interfering with state establishments”). It is this unique history, not incorporation writ large, that renders incoherent the postincorporation reliance on the Establishment Clause’s original understanding.
Justice Thomas, at least, has faced this problem head on. See id., at 45 (opinion concurring in judgment). But even if the decision to incorporate the Establishment Clause was misguided, it is at this point unwise to reverse course given the weight of precedent that would have to be cast aside to reach the intended result. See B. Cardozo, The Nature of the Judicial Process 149 (1921) (“[T]he labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case”).

 See Lee, 505 U. S., at 626 (Souter, J., concurring) (“[A]t best, .. . the Framers simply did not share a common understanding of the Establishment Clause,” and at worst, their overtly religious proclamations show “that they . . . could raise constitutional ideals one day and turn their backs on them the next”); Lynch, 465 U. S., at 716 (Brennan, J., dissenting) (same); cf. Feldman, Intellectual Origins of the Establishment Clause, 77 N. Y. U. L. Rev. 346, 404-405 (2002) (noting that, for the Framers, “the term ‘establishment’ was a contested one” and that the word “was used in both narrow and expansive ways in the debates of the time”).

 See Hovenkamp, The Cultural Crises of the Fuller Court, 104 Yale L. J. 2309,2337-2342 (1995) (“Equal protection had not been identified with social integration when the Fourteenth Amendment was drafted in 1866, nor when it was ratified in 1868, nor when Plessy [v. Ferguson, 163 U. S. 537,] was decided in 1896”); see also 1 L. Tribe, American Constitutional Law § 1-14, pp. 54-55, and n. 19 (3d ed. 2000) (collecting scholarship).

 Justice Thomas contends that the Establishment Clause cannot include such a neutrality principle because the Clause reaches only the governmental coercion of individual belief or disbelief Ante, at 693-694 (concurring opinion). In my view, although actual religious coercion is undoubtedly forbidden by the Establishment Clause, that cannot be the full extent of the provision’s reach. Jefferson’s “wall” metaphor and his refusal to issue Thanksgiving proclamations, see supra, at 724, would have been nonsensical if the Clause reached only direct coercion. Further, under the “coercion” view, the Establishment Clause would amount to little more than a replica of our compelled speech doctrine, see, e. g., West Virginia Bd. of Ed. v. Barnette, 319 U. S. 624, 639 (1943), with a religious flavor. A Clause so interpreted would not prohibit explicit state endorsements of religious orthodoxies of particular sects, actions that lie at the heart of what the Clause was meant to regulate. The government could, for example, take out television advertisements lauding Catholicism as the only pure religion. Under the reasoning endorsed by Justice Thomas, *734 those programs would not be coercive because the viewer could simply turn off the television or ignore the ad. See ante, at 694 (“The mere presence of the monument.. . involves no coercion” because the passerby “need not stop to read it or even to look at it”).
Further, the notion that the application of a “coercion” principle would somehow lead to a more consistent jurisprudence is dubious. Enshrining coercion as the Establishment Clause touchstone fails to eliminate the difficult judgment calls regarding “the form that coercion must take.” McCreary County, post, at 909 (Scalia, J., dissenting). Coercion may seem obvious to some, while appearing nonexistent to others. Compare Santa Fe Independent School Dist., 530 U. S., at 312, with Lee, 505 U. S., at 642 (Scalia, J., dissenting). It may be a legal requirement or an effect that is indirectly inferred from a variety of factors. See, e. g., Engel v. Vitale, 370 U. S. 421, 431 (1962) (“When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain”). In short, “reasonable people could, and no doubt would, argue about whether coercion existed in a particular situation.” Feldman, 77 N. Y. U. L. Rev., at 415.